No. 14399

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

IN THE MATTER OF INQUIRY INTO
J.L.B. YOUTH IN NEED OF CARE.

---

Appeal from: District Court of the Fourth Judicial District,
Honorable E. Gardner Brownlee, Judge presiding.

Counsel of Record:

For Appellant:

Klaus Sitte argued, Legal Services, Missoula, Montana

For Respondent:

Robert L. Deschamps, III, County Attorney, Missoula
Montana
Karen Townsend, Deputy County Attorney, argued,
Missoula, Montana
Suzann Weiland, Deputy County Attorney, argued,
Missoula, Montana
Dennis Lind argued, Missoula, Montana
Mary B. Troland appeared, Assistant Attorney General,
Helena, Montana
David Scott, SRS appeared, Helena, Montana

---

Submitted: February 1, 1979

Decided: MAY 16 1979

Filed: MAY 16 1979

*Thomas J. Kearney*
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

A mother brings this appeal from the conclusions and judgment of the District Court, Fourth Judicial District, which declared her daughter a neglected child, and granted permanent custody over the child to the Department of Social and Rehabilitation Services with authority to consent to her adoption. The mother contends first that section 10-1301(2) (a) and (b), R.C.M. 1947, now section 41-3-102(2)(a) and (b) MCA, defining "abuse" and "neglect" were unconstitutionally vague as applied to her. Second she contends that the appropriate standard of proof to be applied to the State in a termination of parental rights proceeding is the "clear and convincing" standard, rather than the "preponderance of evidence" standard. The mother's third contention is that the District Court abused its discretion in removing the child permanently from her mother because that decision was not supported by even a preponderance of the evidence. We affirm the decision of the District Court.

The child was born on May 16, 1975, when her mother was seventeen years old. Her parents were not married at the time of her birth, nor have they ever been married. They did live together on a fairly regular basis from shortly after the child's birth until December 1977.

In her fifth month of pregnancy the mother was referred to a Public Health Service nurse, Mary McCall, by a high school counselor. From that time on the mother and child have been frequently visited by a variety of health and welfare officials offering assistance and instruction in child care.

Mary McCall testified that she met with the mother and arranged to have a social worker assigned to her. She

further arranged for the mother to meet with an eligibility technician to provide assistance in receiving Medicaid money for prenatal care and arranged an appointment with a physician to provide her with that care. She also referred the mother to the W.I.C. program, a federal nutritional program for women, infants, and children, for prenatal nutritional assistance. A senior student social worker from the University of Montana, Tricia Williams, made weekly visits to the mother from December 1974 until the child was born.

The mother was later referred to the "At-Risk Program" of the Missoula City-County Health Department, which attempts to identify mothers and children that will be at risk for potential health problems due to prenatal or delivery complications. According to Mary McCall, the mother was referred to the program because she was under eighteen, had not had prenatal care for the first five months of her pregnancy, was unable to read or write, had suffered a kidney infection and anemia during her pregnancy, and was unmarried.

As a result of this referral, Mary McCall regularly visited the mother at her mother's home during the summer of 1975 and learned of the baby's problem of staying awake and crying most of the time. In McCall's judgment, the problem was caused by the infant's diet. Her mother had put cereal in her formula, which McCall concluded was probably constipating the baby because she was too young to handle solid food. McCall also found the mother to be depressed and anxious from lack of sleep. She assisted her with the preparation of formula for her baby, demonstrating each step rather than leaving written instructions because the mother was unable to read.

McCall also helped the mother with an application for a low-income housing project in Missoula when she indicated a desire for independence from her home. The mother obtained the low-income housing and lived in her own apartment in the fall of 1975. Another senior student from the University made a total of 22 visits with the mother that fall to assist with care for her child. During that time, McCall received a referral from the W.I.C. program requesting nutritional counseling for the mother, and visited her once again. The mother had been feeding the child soda pop rather than juice, telling McCall that juice gave the baby diarrhea. McCall testified that the mother's apartment was messy, with empty beer cans lying around, sacks of garbage on the floor and dirty dishes in the sink. She also noted that the mother made no effort to pick up her daughter when she cried, and that the baby appeared irritable. McCall was told by the apartment manager that the baby had been crying all night, but the mother denied that claim when asked by McCall.

McCall also had several visits with the baby's father, who was occasionally with the mother during her visits. He told McCall that he hoped to marry the mother sometime, but never had definite plans. He told her that he had failed one armed services test but was hoping to take another so that he could enter the military and then marry the mother. The marriage always appeared to be contingent upon the father's ability to obtain a stable job and home, but those conditions never materialized.

McCall concluded from her association with the mother that she was not retaining the basic child care information given her:

"When I would visit her, I usually reiterated the same kinds of things about nutritional instructions, the need for a regular physician for [the baby], the need for immunizations to protect [the baby] from preventable childhood diseases and many times when I would visit her, this material seemed to be new as if she had never heard it before. She indicated to me that she was not retaining this information that I had been giving her."

In April 1976 the parents brought the baby to Dr. Kit Johnson, a pediatrician, following their attempts to give the baby a "green dish soap" enema. According to the parents, the baby had suffered constipation for three days prior to the attempted enema. Dr. Johnson testified that the baby appeared "acutely ill" and "screamed of pain." He had her admitted to a hospital where she stayed overnight.

Mary McCall had little formal contact with the mother and child after February 1976 when they moved from her geographical jurisdiction. However, she continued to have some contact. On August 24, 1976, the mother appeared in an alley behind the Missoula County Health and Welfare Building as McCall returned from a home visit. She had the baby with her and told McCall that she was going to have a nervous breakdown; that she and the father had had a fight; that she needed a babysitter for her daughter for two weeks; that she had no money or food for the baby; that the father was drinking heavily; that she was angered by the baby's continuous crying; and that she was afraid she was going to hurt the child. The baby was unwashed and carried a bottle of spoiled, curdled milk.

McCall took them into the Department of Social Services to make care arrangements for mother and daughter. With two social welfare workers there, Gwen Peterson and Arlene Grossman, McCall agreed that the baby should be placed in

temporary foster care until her mother was again able to take care of her. The mother went along with this decision, and the child was temporarily placed. The following day, however, the mother reappeared, demanded her child's return, and accused the welfare staff of stealing her daughter.

After some discussion with Peterson, Grossman, and McCall, the mother agreed to placement for her child and herself with a family in Clinton, Montana, where the mother herself had once been a foster child. She later signed a stipulation stating the terms of that agreement, which became the basis of a temporary custody order signed by District Court Judge E. Gardner Brownlee on September 3, 1976. The Baker family, with whom mother and daughter were to stay, agreed to serve as parenting models, helping the mother to understand her responsibilities.

In October 1976, the mother and her child returned to Missoula to live with the father. He had obtained a job and a trailer house, but soon lost the job due to excessive drinking. Through the fall months the mother missed several W.I.C. appointments at which she was to receive high protein foods. She did, however, receive in-home assistance from Beatrice Fournier, a home attendant for the Missoula County Welfare Department. Fournier helped the mother plan menus and, realizing her inability to read, brought her pictures of food groups to aid in her planning. She testified, however, that the mother failed to comprehend the need for a balanced diet and that the instructions were not getting through to her.

In November 1976 Arlene Grossman took the child to Dr. Johnson to examine a stomach rash. Dr. Johnson concluded

that the rash was not significant but diagnosed an infection in both of the baby's ears.  He prescribed an antibiotic, but Arlene Grossman discovered that the mother failed to give her daughter the prescribed amount at the appropriate times.  Nor did the mother return to Dr. Johnson in two weeks for a checkup on the child's ears as she had been instructed.

On January 18, 1977, the child had another appointment with Dr. Johnson.  At that time she exhibited physical and emotional signs which Dr. Johnson concluded required foster placement:

> ". . . at this time the child was very restless and irritable and she was biting on her mother as her mother put it.  She appeared thin, slightly swollen abdomen, her mother stated that she had had inadequate food for the last month because of insufficient amount of money, stated she was not living with [the father], stated [the child] had a cold and not feeding well for the last month . . . The abdomen was slightly distended, the ears, the right was slightly dull indicating that maybe some residual infection . . . I thought at this time the child was maybe suffering from malnutrition and maternal inadequacy, unable to cope with the child."

Dr. Johnson further testified that his examination showed that the child had lost weight since the previous November.

In February 1977 Dr. Johnson again examined the child when her temporary foster mother, Marlene Donnelly, brought her to him.  The ear infection had not yet cleared up but otherwise her physical condition appeared normal.  Mrs. Donnelly described to him, however, that the child had a strong tendency to scavenge for food, especially to eat out of household garbage.  Dr. Johnson testified that such a tendency bears a high correlation to food deprivation.  He reported his findings to the Missoula County Welfare Depart-

ment and testified later that the child did not receive adequate parental care.

Based upon the mother's and daughter's past record of difficulties, and Dr. Johnson's recommendations, Carol LaCasse, a Missoula County social worker, filed a petition for temporary investigative authority and protective services. The District Court granted the petition on January 19, 1977, authorizing the Department of Social and Rehabilitation Services to take temporary custody of the child. During the next several weeks SRS continued to assist the parents in learning parenting skills, but with results similar to those experienced earlier.

In particular, Carol LaCasse sought parenting training for the mother. She placed the child in the home of an experienced foster mother, Marilyn Fernelius, who served as a parenting model for the mother during January 1977. The mother visited Mrs. Fernelius on weekdays and discussed and planned menus with her. Mrs. Fernelius also instructed the mother in disciplining her daughter but testified that the mother was incapable of controlling the baby, that in effect the child controlled her mother. Mrs. Fernelius testified that she observed the same attraction to garbage which Marlene Donnelly later reported to Dr. Johnson. After several weeks Marilyn Fernelius requested that the child be placed elsewhere because she was already providing foster care for a teenage girl who required a great deal of her time. Within a few weeks the child was placed in the foster care of Mrs. Sadie Milward where she remained until the time of the hearing on the petition to grant permanent custody to SRS. While the child stayed with the Milwards, the parents

-8-

visited their daughter and took her with them at times but returning her the same day. The record, however, does not reflect that either natural parent was provided with further parental training services during this time.

Following the child's temporary removal the child and parents had psychological examinations by three psychologists, Dr. Richard Ball, Dr. Herman Walters and Dr. William Stratford. Drs. Ball and Walters, who examined the parents, and Dr. Stratford, who examined the child, all concluded that SRS should seek permanent adoptive custody because of the general inadequacy of the parents, the parents' apparent inability to change, and because of the child's special needs. On the other hand, a psychiatrist, Dr. Noel Hoell, who also examined the mother, concluded that he could find no particular characteristics which would absolutely prevent her from being an adequate parent. He testified that many people with relatively low levels of intelligence are adequate parents.

A pediatrician, Dr. Daniel Harper, saw the mother and child on several occasions as Dr. Johnson's successor after the child had been placed in temporary SRS custody. He testified that following the temporary custody order the child while in the presence of her mother seemed more "bonded" to her foster mother than to her natural mother, and that the child did not look to her own mother as an "orientating" or "guiding" force. Dr. Harper also testified that Dr. Johnson's concerns about growth deficiencies were probably not a source of great concern, since it was later clear that the child was of normal short stature.

Following the hearing on the petition for permanent custody, the District Court issued its findings, conclusions

and judgment. The court found that the mother's limited education and other learning disabilities and the father's excessive drinking had resulted in "improper parenting" and had "subjected the minor child to physical and emotional neglect as well as other evidence of improper training." It found further that the parents were unable or unwilling to provide the necessary training and guidance for their child; that SRS was required to place the child in foster care primarily because of a lack of and need for emotional development; that foster placement had resulted in "great improvement" in her development; that the best interests of the child would not be served by returning her to one or both parents because the natural mother "appears incompetent to face and handle the problems presented to parents by children in their advancing years"; and that the child's best interests could only be met by her adoption "into a home where the parents have demonstrated their ability" to raise and guide a "child with problems."

The court concluded first that the child was neglected and second that her best interests and future welfare could only be served by granting permanent adoptive custody to the Department of Social and Rehabilitation Services. Based upon these findings and conclusions, the court granted custody to SRS with authority to consent to her adoption.

Constitutionality of the Neglect Statute As Applied

The mother's first contention is that section 10-1301(2)(a) and (b), R.C.M. 1947, now section 41-3-102(2)(a) and (b) MCA, was unconstitutionally applied to terminate her parental rights. Her argument is that because section 10-1301(2), which defines "abuse" and "neglect", fails to state

-10-

any specific harms to a child which might justify termination of parental rights, it is subject to overly-broad interpretation and arbitrary application.  She contends that in this case the child is not suffering any particular harm which requires state intervention into family life but that the State merely perceives that the child would be better off in some home other than her natural mother's.  This, she asserts, is an inadequate justification for termination of her parental rights.

This Court has recognized that family integrity is a constitutionally protected interest.  Guardianship of Doney (1977), _____ Mont. _____, 570 P.2d 575, 577, 34 St.Rep. 1107, 1110. As the United States Supreme Court held in Stanley v. Illinois (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551, 558-59:

> "The Court has frequently emphasized the importance of the family.  The rights to conceive and to raise one's children have been deemed 'essential,' Meyer v. Nebraska, 262 U.S. 390, 399 (1923), 'basic civil rights of man,' Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and '[r]ights far more precious . . . than property rights,' May v. Anderson, 345 U.S. 528, 533 (1953).  'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'  Prince v. Massachusetts, 321 U.S. 158, 166 (1944).  The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, at 399, the Equal Protection Clause of the Fourteen Amendment, Skinner v. Oklahoma, supra, at 541, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring)."

The mother contends that section 10-1301(2) will inadequately protect these constitutional interests if it is interpreted to authorize a termination of her rights as a parent in this case.  The statute itself merely defines "abuse" or "neglect":

"(2) 'Abuse' or 'neglect' means:

"(a) the commission or omission of any act or acts which materially affect the normal physical or emotional development of a youth. Any excessive physical injury, sexual assault, or failure to thrive, taking into account the age and medical history of the youth, shall be presumed to be nonaccidental and to 'materially affect' the normal development of the youth.

"(b) the commission or omission of any act or acts by any person in the status of parent, guardian, or custodian who thereby and by reason of physical or mental incapacity or other cause refuses or, with state and private aid and assistance is unable, to discharge the duties and responsibilities for proper and necessary subsistence, education, medical, or any other care necessary for the youth's physical, moral, and emotional well-being."

Since a finding of "abuse or neglect" however gives the District Court jurisdiction to terminate parental rights, Guardianship of Doney, 570 P.2d at 577, 34 St.Rep. at 1110, the meaning applied to it is the parent's only safeguard against unjustified intrusion into the family unit.

To illustrate her contention, the mother contrasts the relatively unspecific terms contained in section 10-1301(2) with the more precise standards proposed by the Institute of Judicial Administration-American Bar Association Joint Commission on Juvenile Justice Standards in its Standards Relating to Abuse and Neglect (Tentative Draft 1977) (IJA/ABA standards). The IJA/ABA proposals are based upon a "strong presumption for parental autonomy in child rearing," and limit "coercive intervention" to protect children "only where the child is suffering or there is a substantial likelihood that the child will suffer, serious harm." IJA/ABA Standards 1.1 and 1.3(A).

The IJA/ABA proposals seek to avoid unnecessary or unjustified intrusions into family integrity by closely defining the grounds for intervention in terms of specific,

-12-

objective, _serious_ harm to the child.  For example, a court

may order in-home supervision or remove a child from his or

her parents if:

> "A child has suffered, or there is a substan-
> tial risk that the child will imminently suf-
> fer, physical harm causing disfigurement,
> impairment of bodily functioning, or other
> serious physical injury as a result of condi-
> tions created by his/her parents or by the
> failure of the parents to adequately supervise
> or protect him/her;

> "A child is suffering serious emotional damage,
> evidenced by severe anxiety, depression, or
> withdrawal, or untoward aggressive behavior
> toward self or others, and the child's parents
> are not willing to provide treatment for him/
> her."  IJA/ABA Standards 2.1(B)and (C).

The rationale behind these standards is particularly

important to the mother's position because the District

Court's findings focused principally on emotional rather

than physical neglect of her daughter:

> ". . . the Department of Social and Rehabili-
> tation Services was required to place this very
> young child in foster homes _partially_ because
> of the child's physical needs but _mostly_ be-
> cause the emotional development of the child
> was so lacking that the only chance for the
> child to have a reasonable future was to place
> the child in a home able to provide for its
> physical and emotional needs."  (Emphasis added.)

As the mother points out, vague abuse and neglect

statutes often result in arbitrary application when the

parents involved in the alleged neglect are poor and unedu-

cated.  Katz, Ambrosino, McGrath & Sawitsky, Legal Research

on Child Abuse & Neglect: Past and Future, 11 Fam.L.Q. 151,

172-75 (1977); Wald, State Intervention on Behalf of "Ne-

glected" Children: Standards for Removal of Children from

Their Homes, Monitoring the Status of Children in Foster

Care, and Termination of Parental Rights, 28 Stan.L.Rev. 623

(1976) (Wald II); Wald, State Intervention on Behalf of

"Neglected" Children: A Search for Realistic Standards, 27

Stan.L.Rev. 985 (1975) (Wald I); Areen, Intervention Between Parent and Child: A Reappraisal of the State's Role in Child Abuse and Neglect Cases, 63 Geo.L.J. 887, 917-32 (1975) (Areen).

It is likely however that the greatest percentage of child neglect cases involve matters similar to the present one in which the alleged neglect results not from the deliberate design of a parent, but rather from the parent's low mental or emotional capacity and low financial status. Wald I at 1020-21; Areen at 888; Dembitz, Welfare Home Visits: Child versus Parents, 57 A.B.A.J. 871 (1971). Parents in this category are sometimes described as "marginal" people: ". . . they are continually at the borderline of being able to sustain themselves--economically, emotionally, and mentally." Wald I at 1021. As Beatrice Fournier described the mother in this case, "Well, I think [the mother] is going to have a hard enough time to take care of herself."

A parent's ability to care for himself or herself naturally affects his or her ability to provide a stable, supportive home for a child. "Such parents may provide little emotional support for their children. While the children may not be physically abused, left unattended, dangerously malnourished, or overtly rejected, they may receive little love, attention, stimulation, or emotional involvement." Wald I at 1021.

The United States Supreme Court has recently observed that middle-class social workers tend to favor long term foster placement for children of such families, "thus reflecting a bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the child."

Smith v. Organization of Foster Families for Equality &

Reform (1977), 431 U.S. 816, 832, 97 S.Ct. 2094, 2105, 53

L.Ed.2d 14, 29 (citing, Rein, Nutt & Weiss, Foster Family

Care: Myth and Reality, in Children and Decent People 24,

25-29 (A. Schorr ed. 1974)). Yet, the mother contends

poverty and its various attendant lifestyles must not be

equated with neglect absent some showing of actual or im-

minent harm to the child. See Wald I at 1001-02; Wald II at

649-50; Areen at 925-28, 930-32.

This Court has held that the State may not terminate a

parent's right to raise his or her own child "merely because

a district judge or a state agency might feel that a non-

parent has more financial resources or pursues a 'prefer-

able' lifestyle." Guardianship of Doney, 570 P.2d at 578,

34 St.Rep. at 1110. Beyond that principle, however, it is

more difficult to say what is the minimum constitutionally

acceptable standard for such an extreme intervention into

family integrity. The IJA/ABA standards, which remain in

tentative draft form, might provide a policy measure by

which to evaluate the adequacy of section 10-1301(2), but

they represent only one proposal. Other proposals are

equally available for our consideration. Areen for example,

has proposed a standard for neglect which is deliberately

less specific than the proposed IJA/ABA standards, espe-

cially in the area most relevant to this case, "emotional"

neglect:

> "A 'neglected' child is one whose physical or
> emotional health is significantly impaired, or
> is in danger of being significantly impaired,
> as a result of the action or inaction of his
> parent, guardian, or primary caretaker." Areen
> at 933.

-15-

While this standard, like the IJA/ABA proposal, focuses the attention of the court on the "condition of the child rather than on parental fault," it deliberately avoids listing specific evidences of emotional damage such as "severe anxiety," "depression," "withdrawal," and "untoward aggressive behavior." The reason, which is of obvious importance here, is a lack of adequate consensus among child behavior experts as to what behavior symptoms indicate emotional deprivation. Areen at 933.

A totally different approach is found in the Model Statute for Termination of Parental Rights (MSTPR), prepared by the Neglected Children Committee of the National Council of Juvenile and Family Court Judges. See, 27 Juv.Just. No. 4, 3, 7 (1976). The MSTPR directs the court to consider the parent's fitness directly rather than look for specific evidence of harm to the child. Section 12(1)(a), for example, requires the court to consider the "emotional illness, mental illness or mental deficiency of the parent, of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental and emotional needs of the child." (Emphasis added.)

In a preface to the MSTPR, its authors, judges from several states, note that they "have not been isolated from nor unmindful of the cross currents of the behavioral sciences which have preoccupied this nation in recent years." 27 Juv.Just. at 3. Yet as judges, they continue, they have been able to "test these theoretical fermentations against the realities of their day-to-day practice." 27 Juv.Just. at 3-4.

The Council of Juvenile and Family Court Judges has responded more directly to the IJA/ABA proposed standards,

concluding that they offer entirely inadequate protection to children:

> "This lengthy volume needs drastic revision in that it totally disregards the rights of a child to be protected and safe in his home environment. These standards greatly limit the process by which a neglected or abused child may be protected through the juvenile justice system. There is an attempt by the authors to restrict the interference of society in the upbringing of children. While this is obviously a worthwhile goal, there needs to be a balance so that youngsters can be adequately protected from the physical and mental abuse and neglect of parents." 8 Juvenile and Family Court Newsletter, No. 6 at 9 (1978).

Thus, the IJA/ABA tentative draft proposals which the mother relies on lack not only a consensus of support among child behavior experts, Areen at 933, but are considered inadequate by the National Council of Juvenile and Family Court Judges. While it is not this Court's position to declare whether one proposal or another is a better approach, we can say with some confidence that the IJA/ABA proposal is not the only constitutional approach. The proceedings in this case need not be measured against the IJA/ABA model and rejected on constitutional due process grounds if they fail to meet its strict standards. See, State v. McMaster (1971), 259 Or. 291, 486 P.2d 567, 569.

Our past decisions indicate that section 10-1301(2) is not so broadly interpreted as to permit termination of parental rights merely because the courts or the concerned social welfare agency disapprove of the parents' lifestyles. See, Guardianship of Doney, 570 P.2d at 578, 34 St.Rep. at 1110; Matter of Fisher (1976), 169 Mont. 254, 258-59, 545 P.2d 654, 656. On the other hand, the statute is broad enough to include emotional deprivation, inadequate nutrition, and extreme and prolonged uncleanliness of the child

under the definition of neglect. Matter of J.J.S. (1978), ____ Mont. ____, 577 P.2d 378, 380-81, 35 St.Rep. 394, 395, 397. See also, Matter of Henderson (1975), 168 Mont. 329, 332, 542 P.2d 1204, 1205-06.

In the present case the District Court's finding of poor emotional development of the child was based on the testimony of several qualified witnesses. The record does not show that the mother deliberately refused to provide emotional support for her daughter. Rather, the social welfare workers who attempted to help her testified that the mother was simply incapable of caring for her daughter, physically as well as emotionally. Thus, this case involves not so much a legal due process problem of notice to the mother of what behavior was expected of her or what she could do to have her daughter returned to her, but rather a human problem of a mother's inability to understand her child's needs and to realistically provide for them.

We are aware that the mother may have received conflicting instructions, especially regarding discipline of her child. However, an overall reading of the testimony indicates that the mother's problem went beyond these apparent conflicts, for she was not even capable of understanding or retaining simple instructions in the first place.

The mother's condition, which was described to this Court as "borderline mentally retarded," presents a special problem which courts in other states have recently considered. The New York Family Court, in Guardianship of Strausberg (1977), 92 Misc.2d 620, 400 N.Y.S.2d 1013, dealt with the same sort of condition as we face here:

-18-

"A summary of the expert testimony . . .
showed the respondent to be a borderline
retarded person, who under stress is easily
confused in her thinking. That at the pres-
ent time and in the immediate future the
respondent has little understanding or capa-
city to provide the nurturance, structure and
controls and fulfill other emotional needs of
a developing child." 400 N.Y.S.2d at 1014.

The court noted particularly the impending difficulties
which would confront parent and child if they were reunited
and expressed concern over the time which further attempts
at training the mother in child care methods would require:

"The older the child gets the more difficult
it will become for the respondent to fulfill
the parental role and provide the direction
structure and other emotional needs of the
child herein. The infant . . . should not be
held in limbo for this indefinite period of
time for the purposes of training the respon-
dent in the area of child care." 400 N.Y.S.2d
at 1015.

On this basis, the court refused to order the child returned
to her mother. However, mental deficiencies alone do not
justify termination if there is no evidence that the child
is in some way harmed or likely to be harmed because of the
parent's condition. In construing its termination statute,
the Minnesota Supreme Court made this requirement clear:

". . . we wish to state unequivocally that
mental illness in and of itself shall not be
classified as 'other conduct' which will per-
mit termination of parental rights. Rather,
in each case, the actual conduct of the parent
is to be evaluated to determine his or her
fitness to maintain the parental relationship
with the child in question so as to not be
detrimental to the child." In re Kidd (Minn.
1978), 261 N.W.2d 833, 835.

See also, In re E&B (Utah 1978), 578 P.2d 831, 833-34; In re
Telles (1978), Cal.App., 151 Cal.Rptr. 263, 266-67; Matter
of Fish (1977), ___ Mont. ____, 569 P.2d 924, 926, 34 St.Rep.
1080, 1083-84.

In the present case the District Court found that the child was harmed by her mother's failure to provide adequate emotional support, and concluded that the mother was "incompetent to face and handle the problems presented to parents by children in their advancing years." These considerations are beyond the mere "poverty" or "lifestyle" characterizations which this Court found inadequate in Fisher and Doney. Here, the District Court's conclusion that the child was harmed by her home environment is supported by the testimony of social workers, physicians, and psychologists. We conclude, therefore, that section 10-1301(2) was constitutionally applied in this case.

Standard of Proof

The mother's second contention on appeal is that the burden of proof required of the State in a termination of parental rights action is the "clear and convincing" standard, and that the State failed to meet that burden. No previous decision of this Court has set forth this requirement, nor is any particular burden mandated by statute. However, in light of our past rulings and the interests involved in such cases, we hold that the state must show, by clear and convincing evidence, that the child is neglected or abused before parental rights may be terminated.

As the foregoing analysis shows, parental interests in raising children are constitutionally protected. We note further that in this case the protection which the mother enjoys is not weakened by the fact that her child was born out of wedlock. Stanley v. Illinois, 405 U.S. at 651-52, 92 S.Ct. at 1213, 31 L.Ed.2d at 559. The constitutional value of protecting family integrity also has received support

-20-

from a policy point of view as noted by the authorities above. Similarly, the declaration of policy which accompanies the statutes governing termination places emphasis on the preservation of family unity "whenever possible." Section 10-1300(4), R.C.M. 1947, now section 41-3-101(1)(d) MCA. See, Matter of Fisher, 169 Mont. at 258-59, 545 P.2d at 656.

In the past this Court has held that the required standard of proof in a termination of parental rights case is "substantial credible evidence" that the child is abused, neglected, or dependent. Matter of Fisher, 169 Mont. at 258, 545 P.2d at 656. Yet, of those states that have considered the issue, most have chosen between a "preponderance of the evidence" standard and the "clear and convincing" test proposed by the mother. See, Matter of Orzo (1975), 84 Misc.2d 482, 374 N.Y.S.2d 554, 564-65 and n. 20. While the distinction between these standards is often elusive, we conclude that the higher standard represented by the "clear and convincing" test more adequately furthers the policy of family unity and more nearly approximates the previous approach of this Court than does the "preponderance of evidence" test. See In re Maria (U.S. Territorial Court, V.I. 1978), 5 Fam.L.Rep. 2089, 2090; In re Telles, 151 Cal.Rptr. at 265-66; Matter of Rosenbloom (Minn. 1978), 266 N.W.2d 888, 889-90.

It is important to observe that this test does not deny children the protection they need. We note in particular that the the "clear and convincing" standard of proof is not as rigorous as the "beyond reasonable doubt" standard. See, In re Maria, 5 Fam.L.Rep. at 2090; In re Telles, 151 Cal.Rptr. at 265; Matter of Rosenbloom, 266 N.W.2d at 889.

-21-

The District Court did not abuse its discretion in concluding that the mother was an unfit parent; rather, its conclusion is supported by substantial credible evidence. The judgment granting permanent adoptive custody to the Department of Social and Rehabilitation Services is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

-22-