No. 79-41

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

_____

IN THE MATTER OF

T. J. D., J. L. D. and R. J. W.

_____

Appeal from:  The District Court of the Thirteenth Judicial
              District, In and for the County of Yellowstone,
              The Honorable Diane G. Barz, Judge presiding.

Counsel of Record:

        For Appellant:

            Stacey and Nye, Billings, Montana

            Damon Gannett, ( Guardian), Billings, Montana

        For Respondent:

            Harold F. Hanser, County Attorney, Billings,
            Montana

_____

                            Submitted on Briefs:   June 5, 1980

                                    Decided: August 12, 1980

Filed:   AUG 12 1980

Thomas J. Kearney
                            Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

This is a consolidated appeal from the order of the Yellowstone County District Court which terminated the parental rights to three children. The mother of all three children appeals from the order terminating her parental rights to each of the children. The father (father to only the infant son) appeals from an order terminating his parental rights to the infant son.

The hearing in relation to the State's petition to terminate the mother's parental rights to each of the three children, was held on May 2, 1979, and a final order of termination was entered on May 24, 1979, terminating the mother's parental rights. A hearing in relation to the State's petition to terminate the father's parental rights to the infant son was held on July 6, 1979 and a final order of termination was entered on July 16, 1979. Because at least two of the issues raised are common to both final orders of termination, the appeals have been consolidated.

The mother and father raise several issues. Both the mother and father contend that there was a lack of clear and convincing evidence to justify the final orders of termination. Matter of J.L.B. (1979), ___ Mont. ___, 594 P.2d 1127, 1136, 36 St.Rep. 896, 908, held that the proof must be clear and convincing to justify a final order of parental termination that a child is, within the meaning of section 41-3-102(2)(b), MCA (1978), abused or neglected. The State met its burden here. The second issue raised is the contention that it was error to bring out at the May 2 and July 6 hearing, that the father had a prior felony conviction--armed robbery. Both the mother and father contend that this was impeachment by prior conviction of a felony which is directly prohibited by Rule

-2-

609, Mont.R.Evid. We determine, however, that the evidence was properly admitted. The third issue concerns the custody of the infant son and the mother and father's contention that the trial court erred in not granting the father's motion to order the State to conduct a home study of the father's parents to determine their suitability to be custodians of the infant son. This motion was made at the conclusion of the July 6 hearing, and it was, under the circumstances here, properly denied. Finally, both parents contend that the Indian Child Welfare Act of 1978, 25 U.S.C. §1901, et seq., (1978), was in effect at the time, and that by virtue of the mother's motion (the mother is a member of the Chippewa Cree Tribe), the proceeding should have been transferred to the jurisdiction of the Chippewa Cree Tribe of North Dakota, or minimally, that the proceedings should have been halted so that the Tribe could be notified of the State court proceedings. We determine, however, that the proceeding against the mother and the father, had been commenced before the effective date of the Act, and therefore that the Act, by its own terms, does not apply.

All three children were born to the mother while she was unmarried. Each apparently has a different father. At the time of the hearing, the mother was twenty-one years old and unmarried. The oldest child, a daughter, was six years old; the second child, a son, was four years old; and the youngest child, a son, was eight months old at the time of the hearing. The alleged fathers of the first two children could not be reached for personal service and therefore service was made by publication. After their failure to appear their defaults were duly entered. The father of the infant son, however, appeared after personal service, and he admitted at the May 2 hearing that he was the father of the mother's third child.

The mother has several personal problems affecting her ability to care for her children. In June 1978, while pregnant with her third child, she plead guilty to a charge of prostitution. She is addicted to alcohol and Talwin. The effects of alcohol are well known. Talwin is a pain reliever which causes euphoria, drowsiness, and in some cases hallucinations. The mother attempted withdrawal from these drugs on a previous occasion, but left the clinic after only a twenty-four hour residency. Expert testimony forecasts that to prevent the mother from lapsing into deepening addiction, in-patient treatment is required for approximately six months. Expert testimony at the mother's hearing also established that she is devoid of parenting skills and lacks the psychological skill to care for her children.

At the time of his hearing, the father was living in his aunt's home with the mother and two other adults. He is not regularly employed, but earns some income by occasionally driving cab and working at the fairgrounds. He has three other children, apparently adopted during a previous marriage, but he does not support them. The father admitted at the hearing that he could not care for the child. The father has lived with the mother off and on for a period of three years. After the child's birth he visited the mother and child three or four times a week, and apparently provided some support for the child. He admitted his own inability to care for the child, but testified that he believed the mother's care of the infant child to be adequate. It was at the end of his own hearing on July 6, that the father moved the court to have the welfare officials conduct a home study of his parents home to determine his father's fitness to care for the infant son.

-4-

An examination of the circumstances leading up to the State's intervention and taking temporary custody of the children, reveals a clear and convincing case for parental abuse or neglect of the three children.

The chain of events seemed to begin in the spring of 1977. At that time the mother moved into an apartment where the owners did not permit children as residents. For this reason the maternal grandparents took temporary care of the two children. The mother contacted the welfare department in June 1977 for help in locating a new apartment which permitted children. The welfare officials suggested that the grandparents continue to provide care until the mother moved into an appropriate apartment. The mother used this time period to indulge in her own activities. She worked in a cafe and also did some traveling. During the next fourteen months, she visited her children only occasionally. During this time period, she became pregnant with her third child, the infant son involved here.

In August 1978, someone made a complaint to the welfare office concerning the boy and girl in the custody of the grandparents. On August 24, 1978 at 11:00 a.m. a social worker, a home attendant, and a police officer, went to the home to check on the children. The young boy was in the yard unsupervised. His black hair was gray from dirt and he smelled of urine. The young girl was sitting alone in an empty bathtub. Both grandparents were highly intoxicated. The grandfather was belligerant. Believing that the circumstances required immediate action, the investigating team removed the children from the apartment and took them to the Billings Receiving Home. Later the same day the children were taken to the hospital. The daughter complained of neck pains and had difficulty in walking. She had severe chills and suffered a seizure. She remained

-5-

hospitalized until September 5, 1978. Later, the girl was found to be suffering from juvenile rheumatoid arthritis.

These events prompted the officials to check into the welfare of the infant son who was with the mother. On August 24, 1978, a public health nurse visited the mother's home to check on the infant son who was born on August 13, 1978. As a result of this visit, a report was made to the county attorney's office, and within a week the county attorney filed a petition for a temporary investigative authority and for protective services. On September 6, 1978, the court issued an order requiring the mother to cooperate with the welfare officials and to permit the social worker's entry into the mother's home.

As a result of these court orders, on September 7, 1978, a home attendant began weekly visits to help the mother develop parental skills. After seven visits to the house, she concluded that the mother had no parenting skills and was not interested in developing these skills. Also, a clinical psychologist examined the mother on October 3, 1978, and determined that the mother could not place her childrens' needs above her own and that she could not provide proper nurture for the infant son. A week after this examination, a public health nurse visited the mother's home to check on the care of the infant. The baby's diapers were filthy and there were no clean diapers in the house. The skin on his penis and scrotum was raw and excoriated. The child also had signs of poor physical development. No baby formula was available in the house and the mother fed juice to the baby from a bottle. The nurse concluded that the mother was incapable of providing for the needs of this infant. Before leaving she made an appointment for October 17 to visit the home again to formally test the baby's development.

-6-

When the nurse arrived on October 17, the baby was not in the home. The following day Dr. Gustafson told the social worker that in light of all these developments, he believed the baby to be in danger and that she should consider removing him from the home. The social worker had already received adverse reports from the home attendant and public health nurse, and she knew that the mother was not attending parenting classes on a regular basis. On October 19, the social worker, the public health nurse, and a sheriff's deputy, went to the mother's home. Three men and a woman were present, but the mother was not at home. The baby was filthy, had diaper rash and cradle cap, and its skull was flattened on one side as a result of lying on the same side for an extended period of time. The social worker immediately removed the baby from the home and took him to a hospital. The baby was formally tested that day in the hospital; he had slow development in three of the four areas tested.

As a result of these actions, the trial court extended the temporary investigative authority order for an additional ninety days. In January 1979, a guardian ad litem was appointed for the children. At the expiration of the ninety day period, the county attorney filed a petition to obtain permanent custody of the mother's three children. This set in motion the notices to the alleged fathers of the daughter and oldest son. Because they could not be found for personal service, they were served by publication and their defaults were duly entered when they failed to appear. The father of the infant son was served on May 1, 1979 and the hearing was scheduled to begin the following day. When the father appeared on May 2, he requested that an attorney be appointed to represent him. The court took the request under advisement, and decided to hold the hearing only in relation to the

State's petition to terminate the mother's rights to her children. A hearing for the father in relation to the infant son, was set for a later time.

Before the commencement of the May 2 hearing, the trial court ruled against the mother's motion to have the cause dismissed or transferred to the Chippewa Cree Tribe pursuant to the Indian Child Welfare Act. No reason was given for the rulings but argument by the State immediately preceding the ruling was that the Act was not in effect when the proceedings here were commenced, and thus the Act was inapplicable.

At the May 2 hearing the father testified when questioned by the guardian ad litem on direct examination, that he had been convicted of armed robbery some nine years before, that he had been out of prison since 1976, and that he was still on parole. The mother's attorney (who was also later appointed to act as the father's attorney) objected on the grounds that one cannot be impeached for prior conviction of a felony. The State did not respond. The trial court simply observed that in proceedings such as this such evidence is admissible. We note in this respect that at the July 6 hearing, the father, under questioning by the court, and with no objection from his counsel, admitted to the felony conviction and to his present parole status.

On May 24, 1979, the trial court entered a final order permanently depriving the mother of her parental rights to her three children. The trial court held a hearing on July 6 with relation to the petition to terminate the father's rights to the infant son. At the conclusion of this hearing the father moved the court, pursuant to section 41-3-406(1)(b) (iii), MCA, to have his parents' home studied to determine the suitability of his father to take care of his child. The trial court immediately denied the motion.

-8-

We have set forth the facts concerning the abuse or neglect of the children. Suffice to say that they clearly and convincingly lead to the inescapable conclusion that the children were abused or neglected within the meaning of section 41-3-102(2)(b), MCA (1978). The remaining issues are whether it was prejudicial error to admit evidence of the father's prior conviction of a felony, whether the court should have required a home study of the father's parents to determine their suitability to care for the infant son, and whether the cause should have been transferred to the Chippewa Cree Tribe of North Dakota under the Indian Child Welfare Act.

Counsel for the father argues that the prior conviction of a felony should not have been admitted for any purpose and that its admission constitutes prejudicial error. He offers no argument however, as to why or how the evidence, under the circumstances of this case, was prejudicial error. Nor does he answer the argument that he waived any right to claim error by not objecting to its admission at the second hearing. Although it was the trial court who elicited the information, it was nonetheless the duty of counsel to object. We thus hold that he waived any right to complain of error. See Rule 103(a)(1), Mont.R.Evid. But even beyond a holding of waiver, we hold that in a case of this nature, the evidence was not only relevant but perhaps even required if the trial court was to get a true picture of the father's background.

Section 41-3-102, MCA (1978), charges the courts with determining whether or not the parents or other custodians have the ability to provide ". . . care necessary for the youth's physical, moral, and emotional well-being." Clearly

-9-

the father's background, including criminal background, is a relevant factor in reaching this determination. While a criminal background does not of course, disqualify one from having the custody of his children, and does not disqualify one from having the appropriate parenting skills, it is a factor that should be considered in a proceeding of this nature. For example, although the crime itself may not be that relevant to the proceedings, whether or not the father had conducted himself as an exemplary parolee or was constantly on the fringes of parole violations is relevant to a proceeding of this nature. We thus hold that admission of the prior felony conviction at each hearing, was not error.

The mother and father next contend that the court was duty bound to grant the father's motion to have a home study of the home of the father's parents in order to determine their suitability to care for the infant son. Section 41-3-406(1), MCA, provides, _inter alia_, that upon a determination of abuse, neglect or dependency, and "to protect the welfare of the youth", the trial court may transfer legal custody to "a relative or other individual who, after study by a social service agency designated by the court, is found by the court to be qualified to receive and care for the youth . . ." The statute is not mandatory, but provides only that the trial court "may" do so. Moreover, there was no evidence presented at the trial by which the trial court's discretion would have been so moved.

The grandfather was, at the time of the hearing, aged 73. He worked in the mornings, as did his wife, who was not

present at the hearing. This employment would have required the grandparents to furnish a babysitter. Although the grandfather testified to having raised many children, his advanced age was a factor to consider as the court had to determine not only his present ability to raise the child but his probable ability to continue in this role. Although custody in the grandparents would provide opportunity for both parents to visit the child, this arrangement would not necessarily be in the best interest of the child. See In Re Gore (1977), ___ Mont. ___, 570 P.2d 1110, 34 St.Rep. 1179. The infant, when he was removed from his mother, had several developmental deficiencies. Since his removal, however, in only four months time he showed remarkable physical and emotional improvement. The circumstances here present no compelling reason to declare that the District Court abused its discretion in not ordering a home study.

As the final issue, the parents argue that this action should have been transferred to the Chippewa Cree Tribe of North Dakota by virtue of the motions made pursuant to the Indian Child Welfare Act. We determine, however, that the Act was not in effect at the time the actions here were commenced and is therefore inapplicable.

25 U.S.C. §1911(b) provides that ". . . In any State court proceeding for . . . termination of parental rights to, an Indian child . . . the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe . . . upon the petition of either parent. . ." The mother not only petitioned the trial court to transfer the proceeding to the Chippewa Cree Tribe of North Dakota, of which she is a member, but also, pursuant to 25 U.S.C. §1912(a) she moved to dismiss or at

least postpone the State court proceeding because the tribe had not been notified of the proceedings. 25 U.S.C. §1912(a) provides in part that ". . . No . . . termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent . . . and the tribe . . . ."

The controlling part of the Act insofar as this appeal is concerned, is 25 U.S.C. §1923, which provides as to the effective date of the Act:

"None of the provisions of this subchapter, . . . shall affect a proceeding under State law for . . . termination of parental rights . . . which was initiated or completed prior to one hundred and eighty days after November 8, 1978, but shall apply to any subsequent proceeding in the same matter or subsequent proceedings affecting the custody or placement of the same child." 25 U.S.C. § 1923.

The State filed its petition for permanent custody on March 1, 1979, and because the Act did not go into effect until May 7, 1979, it is inapplicable to the State court proceedings.

The parents make the additional argument that under the Act, the July 6 hearing on the father's right to custody of the infant son was a "subsequent proceeding in the same matter" and thus falls within the terms of the Act. The definition of child-custody proceeding under the Act includes "any action resulting in termination of the parent-child relationship . . . ." 25 U.S.C. §1903(1)(ii). The July 6 proceeding, however, was not a separate proceeding under the Act. Rather, it was a continuation of the action initiated by the State on February 24, 1979. This action or proceeding was not terminated until the parental rights of both parents had been adjudicated. It is clear, therefore, that the Indian Child Welfare Act did not apply to these proceedings.

-12-

We note that in this case, counsel was appointed as guardian ad litem to represent the children at the District Court hearings and on this appeal. His briefs filed with this Court forcefully argue in favor of the District Court judgments terminating the rights of the parents and giving permanent custody to the SRS.

The separate judgments of the District Court terminating the parental rights of the parents are affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices