No. 88-94

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

_____

IN THE MATTER OF
J.L.S and A.D.S,
Youths in Need of Care.

_____

APPEAL FROM:  District Court of the First Judicial District,
              In and for the County of Lewis & Clark,
              The Honorable Gordon Bennett, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Edmund Sheehy, Jr., Helena, Montana
          J. Mayo Ashley, Helena, Montana

     For Respondent:

          Hon. Mike Greely, Attorney General, Helena, Montana
          George Schunk, Asst. Atty. General, Helena
          Mike McGrath, County Attorney, Helena, Montana

_____

                         Submitted on Briefs:  Aug. 11, 1988

                               Decided:  September 28, 1988

Filed: **SEP 2 8 1988**

_____
                         Ethel M. Harrison
                              Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

The parents of J.L.S. and A.D.S. appeal from a judgment of the First Judicial District, Lewis and Clark County, terminating parental rights to the two children. The District Court awarded the Montana Department of Social and Rehabilitative Services custody of the two children, with authority to assent to adoption. We affirm.

The sole issue raised on appeal is whether the District Court failed to follow the dictates of § 41-3-609, MCA, prior to terminating parental rights to J.L.S. and A.D.S. More specifically:

1. Did the District Court err in holding that the parents failed to comply with a court authorized treatment plan?

2. Did the District Court err in holding that the parents conduct was unlikely to change within a reasonable time?

J.L.S. and A.D.S. are the oldest two of four children born to A.S. (the father) and B.G. (the mother), a couple who have lived together since 1980. At the time of termination of parental rights, J.L.S. was five years of age and A.D.S. four.

The events culminating in the District Court's termination of parental rights to J.L.S. and A.D.S. began on February 25, 1986. On that day, A.S. was arrested for domestic violence and B.G. was hospitalized as a result of this abuse. Both parents had been drinking at the time of this incident.

The children were left in the care of neighbors who later called the Lewis and Clark County Office of Human Services (LCCOHS). Prior to placing the children under

2

temporary foster care, a social worker with LCCOHS observed numerous bruises on A.D.S. A petition for temporary investigative authority and protective services subsequently was filed and granted on February 28, 1986.

Psychological evaluations of the parents and the children were conducted in March of 1986. Clinical psychologist Dean Gregg, Ph.D., diagnosed both parents as having a mixed personality disorder. Psychologist Revel Miller, Ph.D., noted that both parents admitted to the routine consumption of a case of beer or more each night, yet they denied any problems with alcohol or with child abuse. Clinical psychologist Mary Chronister, Ph.D., diagnosed J.L.S. as suffering from major depression, recurrent, with melancholia. Further, she noted that J.L.S. appeared sad and fearful and that the child's cognitive, psychomotor and social skills were all below normal. A.D.S. was diagnosed as having an attention deficit disorder with hyperactivity.

These psychological evaluations were introduced into evidence during hearings conducted on April 15, 17, and 28, 1986. Following the hearings, the District Court granted continuing temporary investigative authority to the State and denied the parents' petition for return of custody of the two children. The District Court adjudicated J.L.S. and A.D.S. youths in need of care and ordered the Department of Social and Rehabilitative Services (SRS) through LCCOHS to retain temporary custody of the two children. The court then ordered respondent to develop a treatment plan, which was approved and adopted by the court at a dispositional hearing on May 15, 1986.

This initial treatment plan required the parents to abstain from the use of all alcohol and other chemicals, and to participate in various types of counseling with Dr. Molineux, the supervising therapist. Both Twila Costigan,

the primary social worker assigned to the case, and Dr. Molineux testified that this first treatment plan was not successful because of the parents' general unwillingness to follow the treatment plan. Although interaction with the children improved some, the father remained particularly hostile and uncooperative toward counseling efforts. Additionally, both parents continued to deny the existence of any problems. Two neighbors also testified that they had witnessed the father drinking beer in late August and again in October of 1986. Jim Hagen, a taxi cab driver, testified that he occasionally delivered beer to the home during the fall of 1986. Neither party contests the failure of this first treatment plan.

On November 13, 1986, upon petition of the State, the court ordered a continuation of the treatment plan and extended LCCOHS' temporary custody of the two children until hearing of the matter on December 18, 1986. At the December hearing, respondent introduced testimony detailing the great improvements noticed in the children's cognitive, emotional, social and psychological welfare during the past eight months of foster care. Based upon this fact and evidence of the parents' failure to abide by the treatment plan as initially formulated, the court continued the placement of the two children in foster homes and designated Dr. Revel Miller, Ph.D., the new supervising therapist with authority to modify the first treatment plan as he determined appropriate.

In January and February of 1987, Dr. Miller scheduled several meetings with the parents and their attorneys to explain the terms of the treatment plan as modified. A.S. failed to show up for the scheduled meeting on three different occasions. B.G. failed to attend the first scheduled meeting. She did, however, keep the second scheduled meeting, but she refused to sign the new treatment

4

plan without A.S. A.S. finally met with Dr. Miller on February 10, 1987, but A.S. became very angry and hostile after an explanation of only two points of the plan. Consequently, he left without signing the plan, stating as he left that he was not going to cooperate with the plan.

Upon request by the parents, a hearing was held on March 12, 1987 to discuss the new treatment plan as modified by Dr. Miller. At this hearing, the court requested that the Lewis and Clark County Attorney either dismiss the case or file a petition for termination. The County subsequently filed a petition for termination on March 25, 1987 and a hearing on the matter was held on May 21 and 22, 1987.

New evidence relating to the matter came to light following the May, 1987 hearing. Consequently, two additional hearings were held on August 14 and October 29, 1987, at which time the County introduced this new evidence. Marylis Filipovich, a social worker with LCCOHS, testified that A.S. had knocked on her door looking for the previous tenant at 6:30 a.m. on July 25, 1987. He had a beer in hand and his breath smelled of alcohol. Further, a barmaid testified that A.S. and B.G. were regular customers at the Ichabod bar in August and September of 1987. She testified that A.S. was permanently thrown out of the bar because of his loud and obnoxious behavior when drinking. In September of 1987, B.G. remained drinking in the bar all evening and then later became involved in a fight outside in the parking lot. Lastly, on October 24, 1987, A.S. was arrested for Criminal Trespass and the processing jailor testified that he was very intoxicated at the time of this arrest.

The District Court subsequently held that the parents had failed to comply with any termination plan, that the conduct or condition of the parents rendered them unfit to give J.L.S. and A.D.S. adequate care, and that the parents

5

conduct was unlikely to change within a reasonable time. Having determined that the best interests of the two children would be best served by permanent placement in a foster home, the court terminated the parental rights on November 12, 1987. This appeal followed.

The issue on appeal is whether the District Court failed to follow the dictates of § 41-3-609, MCA, prior to terminating the parental rights to J.L.S. and A.D.S.

The State may intercede on behalf of a child and file a petition for termination of parental rights "when it is apparent that the natural parent is failing, and is likely to continue to fail to provide the children with a minimally adequate life." In re C.A.R. (Mont. 1984), 693 P.2d 1214, 1221, 41 St.Rep. 2395, 2402; see also § 41-3-602, MCA. The right of the natural parents to care and custody of their children, however, is a fundamental liberty interest. In re R.B., Jr. (Mont. 1985), 703 P.2d 846, 848, 42 St.Rep. 1055, 1058 (citing Santosky v. Kramer (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599). Consequently, the State has the burden of proving by clear and convincing evidence that all statutory termination criteria have been met. In re J.L.B. (1979), 182 Mont. 100, 117, 594 P.2d 1127, 1136.

The primary duty of deciding whether the State has met this burden of proof, and whether custody and parental rights should be terminated, lies with the District Court. On appeal, "all reasonable presumptions as to the correctness of the determination by the district court will be made." In re C.A.R., 693 P.2d at 1218 (citing Foss v. Leifer (1976), 170 Mont. 97, 550 P.2d 1309). Therefore, we will not disturb a decision of the District Court unless a mistake of law exists or the factual findings are not supported by substantial credible evidence. In re V.B. (Mont. 1987), 744 P.2d 1248, 1249, 44 St.Rep. 1838, 1840; In re M.D.Y.R.

6

(1978), 177 Mont. 521, 534, 582 P.2d 758, 766 (citing Solie v. Solie (1977), 172 Mont. 132, 561 P.2d 443).

The section of the statute relevant to this termination case is § 41-3-609(1)(c), MCA, which states:

> (1)   The court may order a termination of the parent-child legal relationship upon a finding that . . .
>
> (c)   the child is an adjudicated youth in need of care and both of the following exist:
>
> (i)   an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
>
> (ii)   the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

Neither party contests the District Court's determination that J.L.S. and A.D.S. are youths in need of care. Appellants do contend, however, that a treatment plan was not in effect at the time of termination and that the court's termination was an abuse of discretion.

Appellants' first contention is without merit. The statute requires only that the parents fail to comply with an appropriate treatment plan. Both Dr. Molineux and Twila Costigan indicated that the first treatment plan approved by the District Court on May 15, 1986, failed due to the parents' lack of cooperation with counseling efforts. Additionally, testimony was introduced which recounted various times when the parents were observed purchasing and/or drinking alcohol in the fall of 1986 in violation of the approved treatment plan. Substantial credible evidence exists supporting a determination that the parents failed to comply with the initial court-approved treatment plan, and it

7

is thus irrelevant whether or not the new treatment plan, as modified by Dr. Miller, was in fact authorized and in effect prior to termination proceedings.

Appellants also contend that the District Court's conclusion that the parents conduct was unlikely to change within a reasonable time was not supported by substantial credible evidence. Section 41-3-609(2), MCA, states that in determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court must find:

> [T]hat continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care.

The court must consider the seven criteria outlined in § 41-3-609(2)(a) through (g), MCA, when making such a determination. The District Court's conclusions of law clearly indicate that the court carefully considered each of these seven factors.

The court found that at least four of the listed criteria applied to A.S. and two applied to B.G. Substantial credible evidence exists in support of these findings. First, the evidence shows that A.S. had a history of violent behavior; he was previously arrested for physically abusing his wife, and numerous bruises found on A.D.S. indicate she was abused as well. Second, testimony by numerous people indicated that both parents routinely drank alcoholic beverages to excess, that they became aggressive and violent under the influence of alcohol, and that they were generally unable to properly care for their children during times of such excess. Third, a physical examination of A.D.S.

8

revealed numerous bruises on her neck, arm, back, buttocks and legs which point to physical abuse. Fourth, the testimony of Twila Costigan and Dr. Molineux indicates that counseling efforts under the initial plan were unsuccessful because of a general hostile and uncooperative attitude, most notably by the father, during counseling sessions. Dr. Miller also testified of his repeated efforts in January and February of 1987 to meet with the parents to explain the modified treatment plan. The last such attempt ended with a statement by A.S. that he would not cooperate with the plan. Given all the above evidence, we hold that the District Court did not err in holding that the conduct and condition of the parents rendered them unfit to provide adequate parental care and that such conduct was unlikely to change in a reasonable time.

Prior to ordering termination of parental rights to J.L.S. and A.D.S., the court also considered the best interests of the two children. This consideration is in accord with the statutory mandate of § 41-3-609(3), MCA, which states:

> In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child. The court shall review and, if necessary, order an evaluation of the child's or the parent's physical, mental, and emotional conditions.

Further, this Court has previously stated that when parents commit acts which deprive a child of an adequate physical and emotional environment, the best interest of the child becomes paramount over parental rights. In re C.A.R., 693 P.2d at

1219 (citing In Re Bad Yellow Hair (1973), 162 Mont. 107, 509 P.2d 9).

Testimony was given that the children had made a lot of progress cognitively, emotionally, and mentally while in foster care. Further, Dr. Miller stated that, in all likelihood, both children would regress to their previous behavioral patterns if returned home. Dr. Guggenheim similarly stated in regards to J.L.S that:

> continued placement in a consistent and supportive home environment would seem extremely important . . . in a child who already has a tendency for passive/ aggressive and manipulative adaptations to stress . . .

Given all the above evidence, we hold that substantial credible evidence exists supporting the District Court's decision to terminate parental rights to J.L.S. and A.D.S. Finding no abuse of discretion, we affirm the District Court's decision.

Justice

We concur:

Chief Justice

Justices

10