No. 89-251

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

IN THE MATTER OF
T.C. & R.C.,
Youth in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Sally M. Johnson, Billings, Montana

For Respondent:

Hon. Marc Racicot, Attorney General, Helena, Montana
Kathy Seeley, Asst. Atty. General, Helena
Harold Hanser, County Attorney; Greg Mullowney, Deputy,
Billings, Montana
Damon L. Gannett; Olsen, Christensen & Gannett, Billings,
Montana

Submitted on Briefs: Oct. 20, 1989

Decided: December 20, 1989

Filed: _____
                 Clerk

'89 DEC 20 PM 1 22
ED SMITH, CLERK
MONTANA SUPREME COURT

Justice Fred J. Weber delivered the Opinion of the Court.

In a hearing for permanent custody, the District Court for the Thirteenth Judicial District, Yellowstone County, ordered the parental rights of T.C. and R.C. terminated and awarded custody to the Montana Department of Family Services. Court-appointed guardian ad litem Damon L. Gannet appeared on behalf of the children. The natural mother, appellant, appeared in person and was represented by court-appointed counsel, Sally M. Johnson. The putative fathers were served by publication with notice of the proceedings but failed to appear. Defaults were entered. The natural mother appeals the termination of the parental rights of R.C.

Two issues are presented on appeal:

1. Was the District Court's finding that R.C. was a "youth in need of care" supported by substantial credible evidence?

2. Did due process require appointment of counsel for the mother prior to the award of temporary custody of the children to the State?

The appellant is the natural mother of T.C. and R.C. The children have different fathers with whom appellant does not have contact. She never married either of the children's fathers nor do either of the children know their father. At the time of the hearing, appellant was 26 and her husband, Mr. H., was 64.

This appeal concerns only R.C. However, we feel it necessary to set forth the facts as they apply to T.C. since the overwhelming evidence with regard to her abuse was properly considered in the determination as to R.C. Appellant became pregnant with T.C. when she was 16 years old. T.C. is now a 10 year old girl. The Children's Protective Services (CPS) involvement began when T.C. was born. Appellant had

2

difficulty in comprehending parenthood and exhibited problems in responding to T.C.'s needs. Appellant and T.C. were living with appellant's maternal grandparents.

In 1979, Dr. Richard Agosto, a clinical psychologist evaluated appellant and determined her I.Q. to be in the borderline range of mental retardation due to poor educational background and lack of environmental and cultural stimulation. The Montana Center for Handicapped Children clinically evaluated T.C. and found she exhibited "significant delays in the area of cognitive skills, self-help skills, and severe delays in the area of speech and language." At this time in her life, appellant's grandparents were the primary caretakers of T.C. During the next year, T.C. demonstrated only a "two to four month gain in intellectual skills." Several agencies were involved with T.C., appellant, and appellant's grandparents over this period but due to the family's refusal to cooperate, the agencies terminated their contact.

Late in 1980, CPS reestablished twice monthly contact with appellant to help her obtain employable skills, develop parenting skills, and clarify who was parenting T.C. Appellant's grandparents were T.C.'s primary caretakers until she was three, at which time appellant's mother, A.C., assumed parenting responsibilities with appellant having infrequent visitations.

In 1985, CPS was again contacted by appellant, this time regarding R.C., appellant's 8-month old baby boy. She was overwhelmed by parenting responsibilities and agreed to allow grandmother A.C. to parent R.C. Ongoing services were again terminated by CPS.

In 1987, the Montana Department of Family Services interviewed T.C. at school in response to a referral received concerning possible sexual abuse of T.C. by an uncle. At

3

this point, T.C. was living with A.C., an aunt (age 16), and R.C. (age 2). T.C. disclosed to the social worker that her Aunt J. was doing "nasties" to her. She explained that Aunt J. was touching and kissing her on her "boobs," "ass," and "lucy," indicating her vaginal area, and made T.C. also touch her in the same places. T.C. further told of seeing Aunt J. and her boyfriend have sex. T.C. said that she had seen Aunt J. perform the same acts on her brother, R.C., and touched and licked his "weiner." Throughout the interview, T.C. displayed abnormal sexual behavior. At the conclusion of the interview, T.C. said she made up the story in order to hurt her Aunt J.

However, just two days later, another interview was conducted in which T.C.'s story remained consistent. She also demonstrated with anatomical drawings where J. touched, kissed, and licked her, and explained that both she and J. wore no clothing during these encounters. She also used the drawings to show where J. touched and kissed R.C. T.C. was video taped playing with anatomically correct dolls. Her behavior with the dolls repeated her story with the drawings. At one point, T.C. asked the social worker if she could remain in foster care until age 18, at which time she would return home "to beat up [J]."

Soon thereafter, Dr. Linda Johnson, a pediatrician at Billings Clinic, conducted a physical examination of T.C. She noted "a vaginal discharge being present" and a "definite fissure in the rectum with the cause being that of an external to an internal force." Dr. Johnson concluded that the results of the examination were consistent with sexual abuse findings. During the course of the examination, T.C. again showed where she was touched by J. She also added explanations which indicated that Mr. H., appellant's husband, was having sexual intercourse with her.

4

On February 18, 1987, the State petitioned the District Court for Temporary Investigative Authority of appellant's two minor children, T.C. and R.C. On the basis of physical, sexual, and emotional abuse and neglect of the children, the petition was granted. On June 11, 1987, after a hearing, the District Court granted temporary custody to the State.

Over the next year, T.C. remained adamant about not wanting to return to live with her family or even see them. She displayed an intense fear of her mother when she would come to visit. A May 1988 visitation was supervised. During that visit T.C.'s "first act once we were all upstairs in the conference room was to attempt to take off her sweater and shirt and to 'show my boobs' to [appellant and appellant's mother]." After this visit, visitations were terminated.

Continued therapy sessions revealed more and more information regarding the abuse suffered by these two children, including being burned with cigarette lighters. Both the things T.C. said and the things she did confirmed her stories of abuse. Her social behavior and intellectual skills improved "remarkably" during the time she stayed with the foster families. Due to "the children's special needs and the apparent inability of the parent to change in a reasonable amount of time," in late May 1988, the social worker recommended permanent custody be granted to the Montana Department of Family Services with consent to adopt. In July 1988, the District Court granted permanent custody of 10-year old T.C. and 4-year old R.C. to the Department and terminated parental rights. The natural mother appeals only as to R.C.

I

Was the District Court's finding that R.C. was a "youth in need of care" supported by substantial credible evidence?

Appellant asserts that the District Court erred in terminating parental rights of R.C. based solely upon

5

statements made by T.C., an emotionally disturbed child. She contends that at the time of the hearing, there was no psychological, medical or physical data generated as to R.C. Thus, she urges that there is no evidence to support the finding that R.C. is a "youth in need of care" as defined in § 41-3-102(2), MCA. She cites In re M.R.L. (1980), 186 Mont. 468, 608 P.2d 134, for the proposition that professional personnel must conclude that the child would be better off if the parental rights were terminated. She maintains that in M.R.L. there was considerable evidence based on the testimony of professionals, to support the court's decision, and that in this case there was no "professional" testimony as to R.C. She contends that the only person who testified about R.C. was social worker, Dan Carlson-Thompson, and that his testimony alone is insufficient. She further contends that the court failed to order an evaluation of R.C. as required by § 41-3-609(3), MCA.

The State correctly points out that § 41-3-609(1), MCA, authorizes the district court to terminate parental rights if certain criteria are found to exist, and it is shown by clear and convincing evidence that the statutory criteria for such termination have been met. Matter of A.H., A.H., J.A.H. (Mont. 1989), 769 P.2d 1245, 1247, 46 St.Rep. 395, 397. Furthermore, it asserts that the district court's decision will not be disturbed unless a mistake of law exists or the factual findings are not supported by substantial credible evidence. Matter of J.L.S. and A.D.S. (Mont. 1988), 761 P.2d 838, 840, 45 St.Rep. 1842, 1845. The State contends the record supports the termination of parental rights in this case. It maintains that after the temporary custody hearing, the order adjudicating T.C. and R.C. youths in need of care, was never appealed and is irrelevant in an appeal of a new proceeding for permanent custody. Relying on In the Matter

of T.Y.K. & D.A.W.R. (1979), 183 Mont. 91, 95-96, 598 P.2d 593, 596, the State urges that when the district court observes abuse of one child, it should not be forced to refrain from taking action until the next child suffers injury. Regardless of the statements by T.C. regarding R.C., the State maintains that there was sufficient evidence to support that R.C. was a youth in need of care. We agree.

This Court will not overturn a transfer of custody of abused, neglected, or dependent youth to the State absent a clear showing of abuse of discretion. Matter of A.H., A.H., J.A.H., 769 P.2d at 1249. Section 41-3-609(1)(c), MCA, provides for termination of the parent-child relationship if the child is an adjudicated youth in need of care and if both (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. Youth in need of care means a youth who is dependent, abused, or neglected as defined in this section. Section 41-3-102(11), MCA. An "abused or neglected" child is one whose normal physical or mental health or welfare is harmed or threatened with harm by the acts or omissions of his parent or other person responsible for his welfare. Section 41-3-102(2), MCA. A "dependent youth" is one who has no proper guidance to provide for his necessary physical, moral, and emotional well-being, Section 41-3-102(10)(c), MCA. In its 1987 order for temporary custody, the District Court found T.C. and R.C. to be dependent youths in need of care because they were in "immediate or apparent danger of harm." The District Court made this finding based on a culmination of reports on T.C. and R.C. from various social workers, psychologists and psychiatrists of various State

7

agencies. T.C. had been involved with State agencies over a period of eight years.

The fact that T.C. is a youth in need of care is not in dispute. R.C. lived in foster homes since he was only 2 years old. During that time, he exhibited behavior problems such as urinating on the floor, becoming self-destructive, hitting himself on the head, spitting and his attention span was "very short." Dan Carlson-Thompson testified that he not only relied on statements from T.C. for his determination that R.C. had been abused and neglected, but that in addition appellant "has not parented [R.C.] and has not demonstrated an ability to do so," and "the family members and extended family members' apparent inability to protect [T.C.] would place [R.C.] at great risk if he was returned to that environment . . ." The District Court reviewed extensive evidence. Clearly, its determination that R.C. was a youth in need of care was based on more than just T.C.'s statements, and § 41-3-102(2) and (10)(c), MCA, have been satisfied. This Court has followed the majority rule that if it is shown that one child is a youth in need of care, "the parent does not have the privilege of inflicting brutal treatment upon each of his children in succession before they may individually obtain the protection of the state." See In the Matter of T.Y.K. & D.A.W.R, 598 P.2d 593, 596.

Once there has been a determination that the child is a youth in need of care, the district court may terminate parental rights if two requirements have been met:

> 1. an appropriate treatment plan that as been approved by the court has not been complied with by the parents or has not been successful; and

> 2. the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

8

Section 41-3-609(1)(c), MCA. These criteria have clearly been met. These children have been parented by appellant for only a brief portion of their lives. Their caretaking needs were tossed from family member to family member and they were abused by several family members. The family denied any abuse even after overwhelming physical and emotional evidence. Appellant, her grandmother, mother, husband and sister all adamantly rejected agency involvement and refused to cooperate with programs the State suggested in attempts to keep the family together. This Court has carefully reviewed the record and we note that it reveals much more abuse than has been elaborated in this opinion. We hold the District Court's finding that R.C. was a "youth in need of care" is supported by substantial credible evidence.

## II

Did due process require appointment of counsel for the mother prior to the award of temporary custody of the children to the State?

Appellant contends that because she was not represented by counsel during the temporary custody proceedings, her due process rights were violated. She relies on Lassiter v. Department of Social Serv. (1981), 452 U.S. 18, which stated that in deciding what due process requires, there are three elements which must be balanced: (1) the private interests at stake; (2) the government's interest; and (3) the risk that the procedures used will lead to erroneous decisions. In short, because as she asserts, parental rights are fundamental rights under the Constitution, she claims she was entitled to appointed counsel throughout the temporary proceedings as a matter of due process.

The State maintains that appointment of counsel is not required for "temporary" custody hearings. We agree.

9

> In child protective proceedings culminating in the termination of parental rights, due process of law requires only that the parents have counsel prior to the _Permanent_ custody hearings. Due process does not require that the parents have counsel during the initial stages of the proceedings. Matter of M.F. (1982), 201 Mont. 177, 653 P.2d 1205. In so holding, this Court relied upon the United States Supreme Court in Lassiter v. Department of Social Services (1981), 452 U.S. 18.

Matter of A.B. (Mont. 1989), 780 P.2d 622, 46 St.Rep. 1734. In Matter of H.R.B. (Mont. 1989), 780 P.2d 1139, 46 St.Rep. 1771, we held that:

> Because the parents' right to custody is a fundamental interest, the State must show by clear and convincing evidence that the statutory criteria have been met. Our decisions hold that we will not reverse a district court's decision regarding findings of fact unless the findings of fact are not supported by substantial credible evidence. (Citations omitted.)

"All reasonable presumptions as to the correctness of the determination by the district court will be made" on appeal. See _Matter of J.L.S.and A.D.S._ 761 P.2d 838.

Appellant was represented by counsel throughout the proceedings for permanent custody. Clearly, she was not deprived of due process. We hold that due process does not require appointment of counsel for the mother prior to the award of temporary custody of the children to the State.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_John Conway Harrison_

_William E. Hunt Sr_

_R. C. McDonough_
Justices