No. 00-804

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 283

IN THE MATTER OF A.F.-C.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

Honorable Katherine R. Curtis, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Julianne Hinchey, Hinchey Law Offices, Kalispell, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; Jim Wheelis,

Assistant Attorney General, Helena, Montana

Thomas J. Esch, County Attorney, Kalispell, Montana

Submitted on Briefs: April 5, 2001
Decided: December 20, 2001

Filed:

_____

Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 H.C. appeals from the Findings of Fact, Conclusions of Law and Order entered by the Eleventh Judicial District Court, Flathead County, terminating her parental rights to A.F-C.

¶2 We reverse.

¶3 H.C. raises three issues on appeal which we restate as follows:

¶4 1. Whether the District Court erred in concluding that H.C.'s treatment plan was appropriate.

¶5 2. Whether the District Court abused its discretion in determining that there was clear and convincing evidence that the conduct or condition rendering H.C. unfit was unlikely to change within a reasonable time.

¶6 3. Whether the District Court erred in relying on hearsay evidence in its Findings of Fact.

¶7 Because we reverse on the first issue, determining that H.C.'s treatment plan was inappropriate, we decline to address the remaining issues.

*BACKGROUND*

¶8 H.C. is the natural mother of A.F-C., born on August 28, 1997. A.F-C.'s father is deceased. The Department of Health and Human Services (DPHHS) first became involved with H.C. in July 1997, when it received a referral that H.C. was pregnant and had been caught shoplifting baby clothes. H.C. was fourteen years old at the time and was living under the care of her grandmother, Mavis, and her aunt, Sherry. DPHHS had been involved with H.C.'s family since the early 1980's as a result of reports that H.C.'s father was deceased and her mother was abusing drugs and neglecting H.C. and her older brother, A.C. At the time H.C. was caught shoplifting, her mother, Sandy, was incarcerated for drug-related charges and awaiting federal sentencing.

¶9 Prior to giving birth to A.F.-C., H.C. was sent to Havre by Mavis and Sherry to live

with Shirley, a friend of the family. H.C. gave birth to A.F.-C while living with Shirley. Shortly thereafter, Shirley was no longer able to provide a residence for H.C. and A.F.-C., and both were returned to Lakeside in September 1997 to live with Mavis and Sherry, who subsequently contacted DPHHS a number of times regarding H.C.'s parenting of A.F.-C. DPHHS received reports that H.C. had bitten A.F.-C. on the face and had become very frustrated and rough with A.F.-C. DPHHS also received a report that H.C. had not sought medical care for A.F.-C. at any time since his birth even though there was apparently a lump on A.F.-C's chest that may have required medical attention. Based upon these reports, neglect was substantiated by DPHHS.

¶10 On December 19, 1997, DPHHS removed H.C. and A.F.-C. from Mavis and Sherry's care and placed them in foster care. DPHHS petitioned the District Court for Temporary Investigative Authority and Protective Services of Sandy's children, H.C. and her brother, A.C., as well as H.C.'s son, A.F.-C., on December 24, 1997. The District Court granted an order for protective services that same day, scheduled a show cause hearing and ordered personal service of the petition to all parties. H.C.'s mother, Sandy, and her grandmother, Mavis, were both served with the petition.

¶11 Present at the show cause hearing on February 17, 1998, was Robert B. Allison, Esq. (Mr. Allison), who had been appointed by the District Court as guardian ad litem for A.F.-C. Also present were H.C.'s grandmother Mavis and her aunt Sherry. H.C.'s mother, Sandy, remained incarcerated. The District Court entered an order on February 23, 1998, granting the State's Petition for Temporary Investigative Authority. Neither H.C. nor A.F.-C. were present at the show cause hearing, nor were their whereabouts known at that time.

¶12 During a visit to the foster home on January 1, 1998, Mavis arranged to have H.C. and A.F.-C. taken from the foster home and driven to Spokane, Washington, to live with Steve, H.C.'s uncle. Mavis did this without the permission of DPHHS and was subsequently convicted of custodial interference and child endangerment. Soon after discovering that H.C. and A.F.-C. were taken to Spokane, DPHHS attempted to perform a home study of Steve's home through a social worker in Washington. The home study was not completed because it was immediately discovered that H.C. and A.F.-C. had left Steve's home and their whereabouts were unknown.

¶13 Although H.C. and A.F.-C.'s whereabouts were unknown at the time, upon the State's motion, the District Court issued an order continuing Temporary Investigative Authority on June 17, 1998. No further contact was made between H.C. and DPHHS until July of

1998, when H.C.'s aunt Shirley contacted DPHHS to inform it that H.C. and A.F.-C. were with her in Kalispell. Foster care training was offered to Shirley and DPHHS eventually licensed her as a kinship placement. H.C. and A.F.-C. remained with Shirley until December 1998.

¶14 On October 2, 1998, DPHHS, in a combined petition, petitioned for temporary legal custody of Sandy's children, H.C. and A.C., as well as H.C.'s son, A.F.-C., and requested that the court adjudicate all three children youths in need of care. It is important to note the complexity of H.C.'s position under this combined petition: H.C. was an alleged youth in need of care by reason of her mother's imprisonment and resultant lack of care; yet she was also a respondent-parent within a simultaneous proceeding to adjudicate her son, A.F.-C., a youth in need of care. Personal service of the combined petition upon H.C.'s mother, Sandy, was unsuccessful. H.C. was personally served on November 12, 1998. Neither Sandy nor H.C. were present at the November 18, 1998, hearing on the petition. Mr. Allison appeared at the hearing as guardian ad litem to represent the interests of A.F.-C. No guardian was appointed to represent the interests of fifteen-year-old H.C. as an abused or neglected child. Further, H.C. had no adult assistance in the simultaneous proceeding to adjudicate A.F.-C. a youth in need of care.

¶15 Because service of the combined petition on Sandy was unsuccessful, the District Court rescheduled the hearing for temporary legal custody as to her two children, H.C. and A.C. The District Court entered H.C.'s default in her role as a respondent-parent of A.F.-C., and entered default Findings of Fact and Conclusions of Law, based on the State's petition and attached affidavit, adjudicating A.F.-C. a youth in need of care and granting the State's petition for temporary legal custody.

¶16 On December 10, 1998, Sandy was served in prison in California with the combined petition. In response, Sandy wrote a letter to the District Court regarding her two children and her grandson A.F.-C. She requested that the court appoint legal counsel for herself, as she did not understand the significance of the proceedings. In the letter, Sandy also relayed to the District Court her understanding that Mr. Allison was the legal counsel for her children, and expressed concern that Mr. Allison had told H.C. that he was not representing H.C. and would not speak to H.C.

¶17 Having served Sandy, another hearing on the combined petition was held on January 7, 1999. Sandy, still incarcerated, did not appear. According to the minute entry, H.C. appeared and gave her consent to the State's request for temporary legal custody of her

child, A.F.-C. In the order of January 14, 1999, the District Court simply states that H.C. had appeared and "acknowledged her consent to the Petition for Temporary Legal Custody." The District Court found H.C. was a youth in need of care, and ordered that temporary custody of H.C. and her brother A.C. be awarded to the State. The order did not address A.F.-C. Finally, the District Court denied appointment of counsel for Sandy, citing this Court's previous decision for the rule that, "unless termination of parental rights is sought, or other long term interference with the parent/child legal relationship by the Department is sought, appointed counsel is not appropriate."

¶18 Previously, in December 1998, placement of H.C. and A.F.-C. with Shirley had broken down for various reasons and both were placed in foster care with Delores Montana Choi (Tanna), a family friend who resided in Kalispell. H.C. and A.F.-C. remained with Tanna for approximately one month. Although H.C. and Tanna both strongly objected to H.C. and A.F.-C. being removed from Tanna's home, DPHHS placed H.C. and A.F.-C. in the mother-baby unit at Florence Crittenton Home & Services (FCH) in Helena in early February 1999.

¶19 At FCH, now sixteen-year-old H.C., signed and entered into her second treatment plan dated January 27, 1999, despite her objections to being there. An earlier treatment plan, signed by H.C. on September 18, 1998, had not been approved by the District Court. On February 17, 1999, the District Court approved and ordered that H.C. comply with the second plan. The second plan contained few written responsibilities or requirements, but rather incorporated the first, non-approved treatment plan, and further required that H.C. follow the rules and recommendations made by FCH within it programs, called "programmatic treatment plans."

¶20 The initial programmatic treatment plan at FCH required H.C. to adhere to all rules and regulations without argument, to actively participate in Positive Peer Culture, consistently attend all therapy appointments, classes, groups, and recreational activities, be responsible for the care of A.F.-C., demonstrating a willingness to follow staff instruction and supervision, engage in age-appropriate interaction with A.F.-C., enroll A.F.-C. in FCH daycare and abide by daycare guidelines, complete daycare and parenting assignments, refrain from using manipulation and learn healthier alternatives to meet her needs, enroll in high school and consistently attend classes, and refrain from running away.

¶21 While at FCH, H.C. entered five subsequent, but essentially similar, FCH programmatic treatment plans within a period of approximately five months. H.C.

continued to sign and enter into each subsequent placement program without a guardian ad litem or upon advice of an adult representing her interests. Additionally, although H.C.'s programmatic treatment plans required H.C. to attend individual therapy, H.C. and her counselor, Sue Kronenberg, did not work well together. H.C. testified that she felt like she could not trust her or talk with her. Although on several occasions H.C. refused to meet or participate in counseling with Kronenberg, counseling sessions between H.C. and Kronenberg continued into the first week of October 1999. The staff at FCH attempted to accommodate H.C. by providing her with a different counselor, but for various reasons, other counselors were not available and H.C. did not again begin individual counseling until after proceedings began to terminate her parental rights.

¶22 On June 21, 1999, after four months at FCH, it was determined that H.C. was not making enough progress and was failing the mother-baby unit. DPHHS removed A.F.-C. from H.C.'s care at FCH and placed him in foster care. On that same day, H.C. was removed from the mother-baby unit at FCH and placed in the Assisted/Independent Living Program. Whereas the purpose of the mother-baby unit is to teach parenting skills to pregnant, parenting, or a soon to be reunited parent, the assisted living program is for non-pregnant, non-parenting young women who are seriously emotionally disturbed and need a therapeutic, moderate level group home. The assisted living program, although structured similar to the mother-baby program, does not contain any parenting component. However, the programmatic treatment plan in effect from June 6, 1999, to October 21, 1999, continued to require that H.C. participate in individualized parenting classes with a case manager and the class coordinator in the event that A.F.-C. be placed back in H.C.'s care in the future. While living in the assisted living program, H.C. received a weekly one-hour visit with A.F.-C. The visitation was eventually reduced to one hour every other week by February 2000.

¶23 The District Court held a permanency plan hearing on July 6, 1999. Although A.F.-C. had been placed in foster care and visitation with H.C. greatly reduced, and although H.C. had been moved from the mother-baby unit to the assisted living program, the District Court entered its order finding that the best interests of H.C. and A.F.-C. would be served if both remained at FCH until H.C. reached 18 years of age, and was able to parent A.F.-C. effectively.

¶24 On August 31, 1999, the District Court granted the motion of DPHHS to extend temporary legal custody of A.F.-C. until January 6, 2000. On September 14, 1999, a team meeting was held between DPHHS social worker Hope Hunter, H.C.'s case manager

Danielle Gennardo, H.C.'s counselor at FCH, Sue Kronenberg, and H.C. The meeting was held to determine H.C.'s future parenting options of A.F.-C. At the meeting, H.C. was asked whether she would be willing to relinquish parental rights of A.F.-C. and was also informed that, as part of the concurrent planning of DPHHS, steps were being taken to terminate her parental rights and that such termination would be pursued in the following months if she failed to make sufficient progress on the FCH programmatic treatment plan. Sue Kronenberg noted H.C.'s reaction to this meeting in her case note of September 14, 1999, stating that H.C. was "very upset and disagreed with the state (DPHHS) and FCH about [H.C.'s] past parenting."

¶25 On November 2, 1999, a family group conference was held at FCH which included H.C. and two of H.C.'s family members, including her uncle Steve, as well as her case manager Emily Hargis, social worker Hope Hunter, and counselor Sue Kronenberg. According to Emily's testimony, the meeting was held to determine where A.F.-C. would go once H.C.'s parental rights were either relinquished or terminated. According to Kronenberg's testimony, her understanding after the meeting was that DPHHS was taking steps to terminate H.C.'s parental rights and that H.C. was not being given another chance to successfully complete the treatment plan or an extension of the treatment plan. According to Emily's testimony, H.C. continued working on the treatment plan only in the hope that the court would decide not to terminate her parental rights. Emily's January 12, 2000, Quarterly Progress Report notes her impression of H.C.'s reaction to the November 2 meeting:

> After the conference, [H.C.] stated she thought it was unfair to have everyone attend the conference to talk about what is going to happen if it had already been decided; [H.C.] was upset that no one in her family was able to change DPHHS's mind. This writer reminded [H.C.] that the purpose of the conference was to provide the opportunity for everyone involved to exchange information and to talk about their concerns, not to reconsider the process that has already been started.

¶26 By January 26, 2000, Hope Hunter made the determination, based upon reports from case managers at FCH, that H.C. was failing to successfully comply with the October FCH programmatic treatment plan. After making a determination that H.C. again failed to successfully comply with the treatment plan, on January 26, 2000, DPHHS petitioned for permanent legal custody and termination of parental rights as to A.F.-C, alleging that H.C. failed to successfully complete her court-approved treatment plan. In its order of March 2, 2000, the District Court appointed counsel as required by § 41-3-607(2), MCA, to

represent the interests of H.C. during the proceeding to terminate her parental rights. Although § 41-3-607(3), MCA, requires the appointment of a guardian ad litem for a minor parent in addition to the minor parent's counsel, one was not appointed.

¶27 The District Court held hearings on the petition for permanent legal custody and termination of parental rights on April 14, May 23, and June 8, 2000. The District Court entered its Findings of Fact, Conclusions of Law, and Order on September 29, 2000, terminating H.C.'s parental rights to A.F.-C. and granting permanent care and custody of A. F.-C. to DPHHS with authority to assent to his adoption. The District Court found that the termination of H.C.'s parental rights was appropriate because H.C. failed to comply with an appropriate, court-approved treatment plan and because the conduct or condition of H. C. rendering termination appropriate was unlikely to change within a reasonable time.

¶28 H.C. appeals the District Court's Order terminating her parental rights.

## STANDARD OF REVIEW

¶29 This Court has not specifically defined what constitutes an "appropriate" treatment plan because no bright line definition is possible in light of the unique circumstances of each case. *In re A.N.*, 2000 MT 35, ¶ 26, 298 Mont. 237, ¶ 26, 995 P.2d 427, ¶ 26 (citations omitted). Factors routinely considered, however, are whether the parent was represented by counsel and stipulated to the treatment plan, and whether or not the treatment plan takes into consideration the particular problems facing both the parent and the child. *In re A.N.*, ¶ 26 (citing *Custody and Parental Rights of M.M.* (1995), 271 Mont. 52, 57, 894 P.2d 298, 301).

## DISCUSSION

¶30 **Whether the District Court erred in determining that H.C.'s treatment plan was appropriate.**

¶31 A natural parent's right to the care and custody of a child is a fundamental liberty interest. This fundamental liberty interest requires that the State provide a fundamentally fair procedure at all stages in proceedings for the termination of parental rights. *In re A.N.*, ¶ 24 (citations omitted). A minor parent is entitled to the same due process protections and procedures as his or her adult counterpart. Article II, Section 15 of the Montana Constitution provides:

**Rights of persons not adults.** The rights of persons under 18 years of age shall include, but not be limited to, all the fundamental rights of this Article unless specifically precluded by laws which enhance the protections of such persons.

See *In re C.H.* (1984), 210 Mont. 184, 202-03, 683 P.2d 931, 940-41.

¶32 Here the District Court terminated H.C.'s parental rights pursuant to § 41-3-609(1)(f), MCA (1997), which provides in part:

> **41-3-609. Criteria for termination.** **(1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:**
>
> . . .
>
> (f) the child is an adjudicated youth in need of care and both of the following exist:
>
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful;
>
> . . .

¶33 H.C. puts forth four arguments in support of her contention that the treatment plan was inappropriate.

¶34 First, H.C. argues that, as both an indigent and a minor at all times during the proceeding, the District Court erred in not appointing counsel to represent H.C.'s interests as a minor parent until the petition for termination of her parental rights was filed in January 2000, long after an opportunity for formal objection to her placement at FCH and formal objection to the treatment plan would have been appropriate or meaningful. H.C. contends that her lack of counsel, combined with her strong objection to placement at FCH, and thus, to the second treatment plan, militates against the appropriateness of the plan.

¶35 Second, H.C. argues that her placement in the highly structured residential facility at FCH was inappropriate. H.C. contends that she was more appropriately placed at Tanna's, especially given H.C.'s success in the first treatment plan outside of a residential facility, as well as H.C.'s early independence and inherent distrust of authority figures.

¶36 Third, H.C. argues that the treatment plan was inappropriate because it required H.C. to participate in therapy with Sue Kronenberg, an individual she did not trust and could not talk to.

¶37 Finally, H.C. argues that the timeline of events from June 1999, up to the petition for termination of parental rights, demonstrates that the goals of the final parenting plan no longer focused on reuniting H.C. and A.F.-C., nor did the treatment plan take into account the particular problems facing parent and child. Further, H.C. argues that the change in focus of the treatment plan combined with the significant pressures H.C. received shortly thereafter from social workers, therapists, and case managers to either relinquish her parental rights or face termination proceedings further demonstrates that the treatment plan was not appropriate.

¶38 Because we reverse on the first argument, we do not reach the other three.

¶39 DPHHS notes that H.C. signed both treatment plans and had notice of and signed each successive FCH programmatic treatment plan. It contends that the plans were appropriate because the plans addressed specific behaviors and goals for H.C.'s personal treatment and attempted to provide her with reasonable parenting skills. It further argues that the plans were designed by professionals at FCH based on observations of H.C.'s behavior and her unhealthy adaptions to her past circumstances.

¶40 This matter presents the unique circumstance that H.C. was adjudicated a youth in need of care and was simultaneously a minor parent in an abuse and neglect proceeding whose own child was adjudicated a youth in need of care. Further, the record reflects that H.C. was confused as to the role played by A.F.-C.'s guardian ad litem, Robert B. Allison, in that H.C. attempted to contact Mr. Allison in order to obtain legal aid to represent her interests as a minor parent, but was told that Mr. Allison was not her attorney, and would not speak with her. This confusion was shared by H.C.'s mother, Sandy, in her December 19, 1998, letter to the District Court requesting that counsel be appointed to advise her during the proceedings and expressing her concern that H.C. appeared to have been turned away by Mr. Allison and had no counsel to represent her interests.

¶41 In its order denying appointment of counsel at the request of H.C.'s mother, the District Court relied on *In re T.C. & R.C.* (1989), 240 Mont. 308, 784 P.2d 392, which held that due process of law does not require that parents have counsel during the initial stages of child protective proceedings, requiring only that parents have counsel prior to the

permanent custody hearings. *In re T.C.*, 240 Mont. at 314, 784 P.2d at 396; *Matter of M.F.* (1982), 201 Mont. 277, 653 P.2d 1205 (citing *Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640). In so relying, the District Court concluded that unless termination of parental rights, or other long term interference with the parent/child legal relationship is sought by the Department, "appointed counsel is not appropriate."

¶42 While we held in *In re T.C.*, and recently reaffirmed in *Matter of M.W & C.S.*, 2001 MT 78, ¶ 25, 305 Mont. 80, ¶ 25, 23 P.3d 206, ¶ 25, that due process requires appointment of counsel at the proceeding to terminate parental rights, we have not held that appointment of counsel is always "inappropriate" or otherwise precluded during earlier stages of child protective proceedings.

¶43 Our holding in *In re T.C.* is derived from the decision of the United States Supreme Court in *Lassiter.* In *Lassiter,* the Supreme Court affirmed the judgment of a North Carolina state court in denying counsel to an indigent parent through the entire proceeding to terminate the parent's parental rights. The *Lassiter* Court declined to hold that the Constitution requires appointment of counsel in every parental termination proceeding, instead adopting the standard in *Gagnon v. Scarpelli* (1972), 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656, leaving the decision for whether due process requires appointment of counsel for indigent parents in termination proceedings to the trial and reviewing courts. *Lassiter*, 452 U.S. at 31-32, 101 S.Ct. at 2162, 68 L.Ed.2d at 652.

¶44 The *Lassiter* Court stated that it "is neither possible nor prudent to attempt to formulate a precise and detailed set of guidelines to be followed in determining when the providing of counsel is necessary to meet the applicable due process requirements . . . [since the] facts and circumstances . . . are susceptible of almost infinite variation." *Lassiter*, 452 U.S. at 32, 101 S.Ct. at 2162, 68 L.Ed.2d at 652-53 (citing *Scarpelli*, 411 U. S. at 790, 93 S.Ct. at 1764, 36 L.Ed.2d at 666). Likewise, this Court has not formulated any guidelines precluding or making inappropriate the appointment of counsel in child protective proceedings which precede termination proceedings, if due process so requires. Rather, whether due process requires counsel to be appointed at earlier stages in the proceedings must be determined in view of all of the circumstances. See *Lassiter*, 452 U. S. at 33, 101 S.Ct. at 2163, 68 L.Ed.2d at 653.

¶45 In the instant case, H.C. was fourteen and pregnant when DPHHS again became involved in her life after receiving reports of her shoplifting. At that time, and throughout

the termination proceedings, H.C.'s mother Sandy was incarcerated, and H.C.'s grandmother, Mavis, and her aunt, Sherry, participated minimally in the proceedings. H.C.'s father was deceased. A.F.-C.'s father was also deceased.

¶46 In the combined abuse and neglect proceedings, H.C. was both an abused and neglected youth as well as a minor parent, yet did not receive the benefit of representation. H.C. attempted to obtain legal advice by contacting Mr. Allison, but was told that he was not her attorney. H.C.'s mother wrote to the District Court requesting counsel as well as expressing concern about whether H.C.'s interests were being represented by legal counsel. Neither H.C. nor anyone representing her was present at the hearing to determine whether A.F.-C. was a youth in need of care. Default was therefore entered against her. Further, at the January 7, 1999, hearing which adjudicated H.C. a youth in need of care, H.C. appeared and represented herself and, according to the District Court order, "acknowledged her consent" that temporary custody of herself be awarded to DPHHS. Although H.C.'s involvement in child protective proceedings is not an issue before the Court in this appeal, the prospect of a minor appearing in court, without assistance or representation, and consenting to the State's custody of her own self, is a fact indicative of the failure of due process in this case.

¶47 H.C. was fifteen and sixteen respectively when she signed the first and the second treatment plans. H.C. and her foster parent, Tanna, strongly objected to H.C.'s placement at FCH and to the treatment plan, yet H.C. had no adult assistance to help her make an appropriate or meaningful objection in a timely manner to the District Court, and therefore, no such objection was made.

¶48 At the June 8, 2000, termination hearing, at which H.C. was represented by counsel, the District Court expressed frustration with H.C.'s counsel for raising for the first time the appropriateness of the treatment plan:

> Well, certainly you can make the argument - or present the evidence, number one, that the reason she didn't comply with the treatment plan is because she felt like there was no use in it, . . . and, secondly, that it wasn't appropriate to begin with, although that seems to be something that should have been litigated back then, before the court approved it, and not now after the fact.

Unfortunately, H.C., an indigent minor parent, did not have any representation or other adult assistance to make an appropriate and meaningful objection at a time when such

objection would have been timely.

¶49 While at FCH, H.C. signed and entered into six different FCH programmatic treatment plans as required by the second court-ordered treatment plan. H.C.'s adult advice while living at FCH consisted of counselors who would also eventually testify in the hearing to terminate her parental rights. The testimony of her case manager, Emily Hargis, aptly demonstrates the tension between the support they attempted to offer H.C. and their role as witnesses for DPHHS:

> [T]here was a distinction for [H.C.] . . . [t]hat she needed support as a mother, . . . that she did not receive our support for her individual because we were part of the proceedings, we were testifying in court. Crittenton was testifying in court for the State essentially. And [H.C.] was having trouble distinguishing between our support of her as an individual versus our support of her as a mother to [A.F.-C.].

¶50 Although the phrase "due process" cannot be precisely defined, the phrase expresses the requirements of "fundamental fairness." *Lassiter*, 452 U.S. at 24-25, 101 S.Ct. at 2158, 68 L.Ed.2d at 648. Fundamental fairness requires fair procedures. *In re A.N.*, ¶ 24. It is therefore imperative that the process by which a treatment plan is implemented must be fair.

¶51 The significance of adult advice for a minor in the context of proceedings to terminate parental rights is acknowledged in § 41-3-607(3), MCA, which requires in relevant part, that "If a respondent parent is a minor, a guardian ad litem must be appointed to serve the minor parent *in addition* to any counsel requested by the parent" (emphasis added). In view of the circumstances presented in this matter, we conclude that, in order to preserve the fundamental fairness of the proceedings, due process required that counsel be appointed for H.C. during the formulation of the treatment plan and prior to the District Court's approval of the plan. The District Court erred in not doing so. Therefore, the treatment plan here cannot be deemed appropriate.

¶52 The order terminating H.C.'s parental rights to A.F.-C. is reversed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ TERRY N. TRIEWEILER