[No. 22930-1-III.   Division Three.   February 13, 2007.]

*In the Matter of the Custody of* A.C.

DAVID N. ET AL., *Respondents*, v. HOLLY MARIE C., *Appellant*.

*Andrea M. Poplawski* (of *Center for Justice*), for appellant.

*David J. Crouse*, for respondents.

¶1 SCHULTHEIS, J. — Anita B. and David N. were foster parents for A.C. during a parental rights termination proceeding in Montana. Before they could finalize adoption of A.C., the Montana Supreme Court reversed the termination and A.C.'s mother—Holly C.—took him to Washington.[1] Anita and David then filed a petition for nonparental custody in Spokane County Superior Court. In granting their petition, the trial court noted that Holly was not unfit, but that continued placement with her would detrimentally affect A.C.'s development. A.C. now lives in Montana with Anita and David. His mother has visitation rights and pays Anita and David child support.

¶2 Holly appeals, contending the Spokane County Superior Court did not have subject matter jurisdiction over the custody petition and erred in considering the hearsay statements of A.C., the report of the guardian ad litem (GAL), and the conclusions of the mental health assessor. She also contends the trial court applied the incorrect "best interests of the child" standard for custody. Finding that the Washington court correctly asserted subject matter jurisdiction over this matter, did not abuse its discretion in considering the evidence, and applied the more stringent standard appropriate for nonparental custody decisions, we affirm.

FACTS

¶3 The Montana Department of Health and Human Services (DPHHS) first became involved with Holly in July 1997, when she was 14 years old, pregnant, and caught shoplifting for baby clothes. Holly was incarcerated for

---

[1] For clarity, we refer to the adult parties by their first names.

drug-related charges at the time and was sent to live with a friend of the family. A.C. was born in August 1997. His biological father was deceased. Over the next couple of years, he and Holly lived in foster care, with a relative, on their own, and in a group home. During this period, DPHHS received reports that Holly occasionally became frustrated with A.C. and treated him roughly (including a report that she bit him in the face). She also failed to seek medical care for a lump on A.C.'s chest. Based on these reports, DPHHS obtained an order for temporary investigative authority (TIA) over Holly and A.C. and petitioned for temporary legal custody of Holly as well as of A.C.

¶4 Holly and A.C.'s placement in a Helena group home treatment facility in February 1999 was not successful. On several occasions, Holly refused to participate in ordered counseling sessions and was reported to have neglected or mistreated A.C. In June 1999, DPHHS removed A.C. from Holly's care and placed him with Anita and David as foster parents. Eventually, DPHHS petitioned for permanent legal custody of A.C. and termination of Holly's parental rights. At this point, the court appointed counsel to represent Holly during the termination proceedings. Holly's parental rights were terminated by court order in September 2000, and Anita and David initiated adoption proceedings. Holly appealed the termination.

¶5 In December 2001, the Montana Supreme Court reversed, concluding that due process required appointment of counsel during the formulation of Holly's treatment plan. *In re A.F.-C.*, 2001 MT 283, 307 Mont. 358, 370, 37 P.3d 724. A.C. continued to live with Anita and David until May 2002 while Holly voluntarily participated in a TIA transition program for reunification with her son. She also obtained her GED (general educational development) and completed a 75-hour nurse aide certification. The Montana DPHHS terminated the TIA in April 2002, when Holly fulfilled all the requirements of her treatment plan. In the letter informing Holly of the dismissal of the TIA, a representative of DPHHS stated, "You cooperated fully with the

Department and the transition was as successful as could be expected considering the obstacles presented. I hope you and [A.C.] continue to do well." Clerk's Papers (CP) at 255.

¶6 Soon after A.C. was returned to Holly's care in May 2002, she moved with him to Spokane. She allowed Anita and David visitation with A.C. roughly monthly until September 2002, when she decided to prevent contact because A.C. was defiant when he returned from visits with them. A.C. entered kindergarten in September and reportedly did well at school.

¶7 In early October 2002, the Spokane County Child Protective Services received an anonymous call from someone who claimed that A.C. was being punched and thrown around by his violent mother. The caller claimed that Holly had extensive involvement with Montana's child protective services and "wasn't ever interested in parenting but was interested in winning in court." CP at 263. The caller also claimed that immediately after A.C. was returned to Holly "on a technicality," she fled from Montana. CP at 284. A letter from Anita and David to the Spokane office of the Washington Department of Social and Health Services (DSHS) that same month stated that A.C. had been returned to Holly "due to a legal technicality." CP at 266. They offered to continue providing "foster/adoptive care" to A.C. "should the need arise." *Id.*

¶8 DSHS began an investigative assessment of Holly in October 2002. A case worker called Holly's Montana social worker, who explained Holly's DPHHS history and opined that Anita and David were the ones who called with the anonymous allegations of abuse. According to the social worker and a supervisor at DPHHS, the foster parents were vindictive because A.C. had been returned to his mother, and they became even more upset when Holly stopped the monthly visits. After a few weeks of investigation, the DSHS case worker concluded that although A.C. was still defiant with Holly and did not believe she was his mother, he was in no danger of abuse and should be fine with continued counseling. DSHS ended its service in late Octo-

ber, finding little or no risk. However, Holly did not provide A.C. with the recommended counseling.

¶9 On October 29, 2002, Anita and David filed a petition in Spokane County for nonparental custody of A.C. The petition alleged that Washington had jurisdiction as the home state. It also alleged that Holly was not a suitable custodian and requested limited parental visitation because Holly had engaged in the following conduct: "Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions. Physical, sexual or a pattern of emotional abuse of the child." CP at 5. Holly failed to obtain counsel or to respond to the petition and a default judgment was entered against her in December 2002. She then hired an attorney, who entered a notice of appearance and successfully moved to vacate the default judgment. Her response to the petition for nonparental custody admitted the assertion of Washington jurisdiction.

¶10 In March 2003, Mary Ronnestad was appointed A.C.'s GAL. Also that month, Anita and David moved for a temporary order of visitation and for a bonding and attachment assessment. The trial court granted their motion and ordered counseling for A.C. with therapist Carol Thomas, who was recommended by Ms. Ronnestad.

¶11 Holly's attorney withdrew in early August 2003. Later that month, Anita and David moved for a temporary order placing A.C. with them pending trial. On August 29, the trial court ordered temporary custody of A.C. with Anita and David in Montana and set out a schedule of visitation for Holly.

¶12 Holly obtained new counsel through the Spokane Center for Justice in October 2003 and successfully moved to continue trial beyond its original date of October 20. She moved to dismiss the nonparental custody petition in January 2004, arguing for the first time that Washington did not have subject matter jurisdiction because Montana was the home state and had continuing jurisdiction over A.C.'s custody. The motion was denied.

¶13 After trial in February 2004, the court granted residential custody of A.C. to Anita and David, with scheduled visitation for Holly. Although the trial court did not find that Holly was an unfit parent, it stated that the evidence was "very clear that continued placement with the mother would detrimentally affect [A.C.'s] growth and development." CP at 465. This appeal timely followed.

## SUBJECT MATTER JURISDICTION

¶14 Holly first challenges the Washington superior court's subject matter jurisdiction over the nonparental custody petition. She contends Montana, not Washington, was A.C.'s home state at the commencement of the action, and further argues that Montana had continuing jurisdiction over A.C.'s custody. Anita and David respond that Holly consented to Washington's jurisdiction and waived this issue in her response to the petition.

¶15 Washington superior courts have general jurisdiction and lack subject matter jurisdiction only when expressly denied. *In re Marriage of Thurston*, 92 Wn. App. 494, 498, 963 P.2d 947 (1998). Subject matter jurisdiction is the court's authority to hear and determine cases within a particular class of actions. *Id.* at 497-98. Lack of subject matter jurisdiction renders the superior court powerless to pass on the merits of a case. *Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County*, 135 Wn.2d 542, 556, 958 P.2d 962 (1998). Contrary to the argument of Anita and David, however, subject matter jurisdiction cannot be conferred by the consent of the parties. *Wampler v. Wampler*, 25 Wn.2d 258, 267, 170 P.2d 316 (1946); *In re Custody of R.*, 88 Wn. App. 746, 762, 947 P.2d 745 (1997). Although parties may waive their right to assert lack of personal jurisdiction, they may not waive subject matter jurisdiction. *Skagit*, 135 Wn.2d at 556. "Any party to an appeal . . . may raise the issue of lack of subject matter jurisdiction at any time." *Id.*

¶16 This court reviews questions of subject matter jurisdiction de novo. *Thurston*, 92 Wn. App. at 497.

Under Washington's Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), chapter 26.27 RCW, a Washington court has subject matter jurisdiction to make an initial child custody determination only if (1) Washington is the child's home state on the date of the proceeding's commencement, or was the home state within six months before commencement, and the child is absent from the state but a parent or "person acting as a parent" continues to live in the state; or (2) no other state has jurisdiction or has declined jurisdiction because Washington is the more appropriate forum and (a) the child and at least one parent or person acting as a parent have a significant connection with Washington other than mere physical presence and (b) substantial evidence is available in Washington regarding the child's care, protection, training, and relationships. RCW 26.27.201(1); *In re Marriage of Hamilton*, 120 Wn. App. 147, 151, 84 P.3d 259 (2004). We address first whether Washington or Montana was A.C.'s home state.

¶17 The child's "home state" is the state in which the child lived with a parent or person acting as a parent for at least six months immediately before the custody proceedings commenced. RCW 26.27.021(7). A.C. had not lived in Washington or Montana for a full six months immediately before Anita and David filed the petition for nonparent custody. (Holly and A.C. moved to Washington some time in June 2002 and the petition was filed on October 29, 2002.) Consequently, neither Washington nor Montana was his home state. *Id.*; *see Hamilton*, 120 Wn. App. at 154. We then ask whether this case meets the alternate basis for jurisdiction: whether A.C. and Holly had significant connections, other than mere presence, with Washington, and whether there is substantial evidence in the state regarding A.C.'s care, protection, training, and relationships. RCW 26.27-.201(1)(b).

¶18 Holly contends all information regarding A.C.'s history is in Montana, including all evidence pertinent to the Montana dependency and termination proceedings. She notes that A.C. lived in Montana and attended school and

counseling sessions in Montana at the time of trial. She also argues that she is registered with the Blackfeet Tribe in Montana and has many family members on that reservation. Jurisdiction is determined at the time the custody petition is filed, so A.C.'s contacts with Montana after the proceedings commenced are not relevant. RCW 26.27.201. Holly's membership in the Blackfeet Tribe also is not particularly relevant, especially considering that she was not registered when the petition was filed, A.C. is not registered, and she recounted no visits with relatives on the reservation. Although information regarding the prior termination proceedings was in Montana, those proceedings had ended in December 2001.

¶19 On the other hand, much information relating to A.C.'s care, training, and personal relationships was available in Washington. After reversal of the Montana termination proceedings, Holly's parenting of A.C. took place entirely in Washington (although only for less than six months). She had lived with an uncle in Spokane for several months when A.C. was a baby. *A.F.-C.*, 307 Mont. at 360-61. On her return to Spokane, she lived with her boyfriend, got a job, and placed A.C. in school. Those contacts constitute significant connections with Washington. Substantial information regarding A.C.'s care, protection, training, and relationships was available through his school teacher, his counselor, and Holly—all of whom resided in Washington. The Washington superior court properly assumed subject matter jurisdiction over the petition to determine the custody of A.C.

¶20 Holly next contends Washington cannot assert jurisdiction over A.C.'s custody because Montana has continuing jurisdiction over this issue. Under the federal Parental Kidnapping Prevention Act of 1980 (PKPA), 28 U.S.C. § 1738A(d), a state that has made a child custody or visitation determination has continuing jurisdiction as long as the state remains the residence of the child or of any contestant. Holly contends Montana made a custody determination when it terminated her parental rights, reversed

that termination, and imposed a TIA. However, the PKPA does not apply unless a custody decree already exists or there is a custody action pending in another state. *In re Marriage of Murphy*, 90 Wn. App. 488, 496, 952 P.2d 624 (1998). No Montana custody decree appears in the record. And Montana had dismissed all investigations and proceedings regarding Holly and A.C. after her parental rights were reestablished. In short, the record does not show that Montana had continuing jurisdiction over the issue of A.C.'s custody.

¶21 Holly also argues that Washington should have declined jurisdiction because this is an inconvenient forum. RCW 26.27.261 provides that a Washington court may decline jurisdiction if it determines that it is an inconvenient forum and a court in another state is a more appropriate forum. The court is urged to consider such factors as the length of time the child has resided in another state, the distance to the other state's court, the relative financial circumstances of the parties, the nature and location of the evidence needed to resolve custody (including the testimony of the child), and the familiarity of each state's courts with the facts and issues in the pending litigation. *Id*. A decision to decline jurisdiction is discretionary with the court. RCW 26.27.261(1); *Myers v. Boeing Co.*, 115 Wn.2d 123, 128, 794 P.2d 1272 (1990); *In re Marriage of Owen*, 126 Wn. App. 487, 503-04, 108 P.3d 824 (2005).

¶22 The trial court here concluded that the request to decline jurisdiction was inappropriate because it was made a week before trial, after the GAL had completed her report and the bonding analysis had been completed in Spokane. The trial court's decision to retain jurisdiction was not unreasonable or based on untenable grounds, especially in light of the fact that Holly lived in Spokane. *Myers*, 115 Wn.2d at 128.

## ADMISSION OF EVIDENCE

¶23 Holly next contends the trial court erred in basing its decision in part on the evidence provided by Ms.

Thomas. She contends Ms. Thomas's evaluation was based on inadmissible child hearsay statements, was incomplete, and was based on an incorrect standard for determining custody issues. This court generally reviews the trial court's admission of evidence for abuse of discretion. *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 168, 876 P.2d 435 (1994). "A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds." *Id.*

¶24 Under RCW 26.10.130(1), the trial court in a contested custody proceeding may order an investigation and report concerning custody arrangements and may appoint a GAL for the child under RCW 26.12.175. In preparing the report, the investigator (the GAL or someone from a professional social service organization) may consult with "medical, psychiatric, or other expert persons" who have served the child. RCW 26.10.130(1), (2). The investigator's report may be received in evidence at the hearing, as long as it meets the notice requirements of the statute. RCW 26.10.130(2), (3). In his or her role to protect the child's best interests, the GAL and any other investigators may make recommendations based on the independent investigation, "which the court may consider and weigh in conjunction with the recommendations of all of the parties." RCW 26.12.175(1)(b). Additionally, the GAL must report any custody preference expressed by the child, along with information regarding the child's ability to understand the proceedings. *Id.*

¶25 By order of the court here, a GAL was appointed and counseling was ordered for A.C. to address behavioral issues and to aid in the GAL's assessment of A.C.'s degree of attachment. The GAL chose Ms. Thomas as counselor, and Ms. Thomas's report was accepted into evidence as plaintiff's exhibit 3. At the hearing, Ms. Thomas explained that she scheduled family sessions with A.C. and either Anita and David or Holly so that she could give the GAL information on A.C.'s relationships with his foster parents and

his mother. She also met with A.C. individually. During the course of her testimony, she occasionally repeated statements A.C. made during these sessions. Defense counsel's objections to these statements as child hearsay were overruled. Holly contends on appeal that the trial court erred in admitting these hearsay statements because they did not qualify under the medical treatment exception, ER 803(a)(4).

¶26 Hearsay, described generally as an out-of-court statement offered into evidence to prove the truth of the matter asserted, is not admissible at trial unless it qualifies as an exception. ER 801(c), 802. One of the recognized hearsay exceptions is the statement made for the purposes of medical diagnosis or treatment. ER 803(a)(4). This statement may describe the declarant's past or present symptoms, pain, or sensations. *Id.*

¶27 Holly contends Ms. Thomas's interviews with A.C. were not conducted for diagnosis or treatment, but to prepare an assessment report. The trial court concluded, however, that Ms. Thomas acted as A.C.'s therapist and also as the preparer of the forensic evaluation. The record supports this conclusion. As foundation for her testimony, Ms. Thomas explained that she told A.C. her office was where children could come and talk about what they love to do and what causes them problems. Although she was not sure that a child his age could understand what a therapist was, she thought she communicated the concept that her office was a therapeutic environment. In her opinion, A.C. understood that her role was to help him. Her observations of A.C.'s conduct and statements were made during counseling sessions and therefore were properly admitted under ER 803(a)(4).

¶28 Holly's additional challenges to Ms. Thomas's testimony are without merit. She first contends Ms. Thomas's report was incomplete because Ms. Thomas did not consult with A.C.'s previous counselors. The limited nature of Ms. Thomas's evaluation—based entirely upon her personal interaction with A.C., Holly, and Anita and David—

was freely admitted at the hearing, and the trial court accepted her testimony on this basis. Second, Holly contends Ms. Thomas applied the standard for determining custody between two parents—the best interests of the child—rather than the standard used in a custody dispute between a parent and a nonparent, which favors the parent. *See In re Custody of Shields*, 157 Wn.2d 126, 142, 145, 136 P.3d 117 (2006) (when determining custody between a parent and a nonparent, the best interests of the child standard is inappropriate). Although it is correct that Ms. Thomas addressed the best interests of A.C., her expert opinion was merely evidence for the trial court's ultimate determination of custody. The trial court's findings of fact indicate that it did not apply the best interests of the child standard. Accordingly, Ms. Thomas's misinterpretation of the appropriate standard had no effect.

CUSTODIAL DECISION

¶29 Finally, Holly contends the trial court applied the incorrect standard in awarding custody to Anita and David. She argues that the trial court found her to be a fit parent, yet awarded custody to the nonparents because they had developed a psychological bond with A.C and because custody with Anita and David was in the best interests of the child. She contends a child's bond with so-called "psychological parents" is insufficient to overbalance the natural parent's constitutional rights to privacy and protection of the family. This court reviews the trial court's child custody decision for abuse of discretion. *Shields*, 157 Wn.2d at 150.

¶30 Recently, in *Shields*, the Washington Supreme Court held that the best interests of the child standard was unconstitutional in a custody proceeding between a parent and a nonparent because that standard does not give the required deference to parental rights. 157 Wn.2d at 142 (citing with approval *In re Marriage of Allen*, 28 Wn. App. 637, 646, 626 P.2d 16 (1981)). Although *Shields* noted that

the best interests of the child standard, adopted in RCW 26.10.100 for nonparental custody actions, is proper when determining custody between parents or between nonparents, a custody dispute between a parent and a nonparent requires a more stringent balancing test. *Id.* at 142, 145 n.8. The parent's rights may be outweighed only in two instances: (1) when the parent is unfit or (2) "when actual detriment to the child's growth and development would result from placement with an otherwise fit parent." *Id.* at 143. When, as in this case, the trial court concludes that the parent is fit, the nonparent is required to make a substantial showing that placement of the child with the parent will result in actual detriment to the child's growth and development. *Id.* at 145. This heightened standard will be met by the nonparent only in extraordinary circumstances. *Id.*

¶31 The record shows that the trial court understood the proper standard to be applied. In its oral ruling, the court stated, "It's only if the detriment to [A.C.] outweighs [Holly's] rights that I can find that the allegations of the petition [have] been satisfied." Report of Proceedings at 812. Evidence showing actual detriment to A.C.'s development is listed in the findings of fact and the trial court's oral ruling. The court noted that although Holly has made great strides in getting her life together, after fewer than five months with his mother, A.C. began to show anger, agitation, aggression, and out-of-control behavior at school. When talking to counselors, A.C. frequently stated that he missed Anita and David, expressed anger toward his mother, and denied that Holly was his real mother. He had to be sent home on two occasions because he was so disruptive. By June 2003, he was considered to have severe behavioral issues.

¶32 Ms. Thomas observed that A.C. was distant and detached with his mother. He told Ms. Thomas he hated Holly and he felt like he was being killed when he lived with her. He had a negative self-image while he was in his mother's custody and felt he was bad. In contrast, he

appeared bonded with Anita and David and grieved when separated from them. Ms. Thomas concluded Anita and David were A.C.'s "psychological parents." CP at 463. She was greatly concerned that continued placement with Holly "would result in increased depression, withdrawal, rebellion, self-destructive behaviors, [and] violent behaviors toward others." CP at 463. The trial court found Ms. Thomas's testimony very important to its determination of the issues, and noted that even Holly's expert witness confirmed that A.C. profoundly grieved for Anita and David and would be traumatized by reunification with his mother.

¶33 Additionally, the trial court found that Holly's attitude toward A.C. appeared "at best, casual." CP at 464. Although she was advised by numerous people in Montana and Washington to seek counseling for A.C. during the reunification process, she refused to admit that he had any behavioral or emotional issues, and she did not take him to a counselor until she was required to take him to Ms. Thomas. In a finding better labeled as a conclusion of law, the trial court stated that although Holly was not an unfit parent, "[i]t's very clear that continued placement with the mother would detrimentally affect [A.C.'s] growth and development." CP at 465.

¶34 Holly points out that the trial court also found that Anita and David were A.C.'s psychological parents. In *Shields*, 157 Wn.2d at 145, the court expressed disapproval with "incautious use of terms such as psychological parent, in loco parentis, and de facto parent." To give "legal effect" to the status of de facto parent, *Shields* continued, the court must first find that "the natural or legal parent consented to and fostered the parent-like relationship." *Id.* at 145. Holly never consented to Anita and David's custody of A.C. Consequently, Anita and David cannot use the status of psychological parents to interfere with Holly's constitutionally protected rights. *Id.* at 146. Even with removal of the trial court's finding that Anita and David were A.C.'s psychological parents, however, the court's remaining findings support its conclusion that continued placement with

Holly would result in actual detriment to A.C.'s growth and development.

¶35 Holly also contends that the trial court actually applied the best interests of the child standard rather than the detriment to the child standard. She notes that the findings of fact and conclusions of law contain a section entitled "BEST INTEREST OF THE CHILD/FINDINGS OF THE COURT," followed by "The court's conclusions concerning the best interests of the children are based on the following facts." CP at 460. Later, under the section in the conclusions of law entitled "DISPOSITION," the document states that "[i]t is in the best interest of the child to reside with [Anita and David] for the reasons set forth in the findings." CP at 466. Despite this language, which is apparently contained in the standard custody form used by the court to draft its findings and conclusions, the trial court's findings and its oral ruling clearly establish that it applied the heightened actual-detriment-to-the-child standard required for determining custody between a fit parent and a nonparent. Because the evidence supports the trial court's findings of fact, and the findings were correctly applied to the proper standard to reach the conclusions of law, the trial court did not abuse its discretion in placing A.C. with Anita and David.

¶36 Affirmed.

SWEENEY, C.J., and KULIK, J., concur.

Review granted at 162 Wn.2d 1005 (2007).